UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,                         No. 13-cr-72 (JRT/LIB)

v.                                                **REPORT AND RECOMMENDATION**

Larry Good,

                Defendant.

---

This matter came before the undersigned United States Magistrate Judge upon Defendant's Motion to Dismiss the Indictment, [Docket No. 32]; his Motion to Dismiss the Indictment Due to Selective Prosecution, or for Additional Discovery, [Docket No. 30]; and his Motion to Suppress Statements, Admissions and Answers, [Docket No. 31]. The case has been referred to the Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a hearing on July 2, 2013, regarding the Defendants' motions for discovery,[1] dismissal, and suppression. For reasons outlined below, the Court recommends that Defendant's motions to dismiss, [Docket Nos. 30, 32], be **DENIED**, and that his motion to suppress statements, [Docket No. 31], be **GRANTED**.


I.      **BACKGROUND**

Larry Good ("Defendant") is charged with one count of Transportation, Sale and Purchase of Fish Taken in Violation of Tribal Law, in violation of 16 U.S.C. §§ 3372(a)(1) and 3373(d)(1), and 25 C.F.R. §§ 242.2 and 242.4. (Indictment [Docket No. 1] at 1-2). Defendant was indicted on April 9, 2013, and made the present motions on June 20, 2013. The Court held

---

[1] The discovery motions were the subject of a separate Order. [Docket No. 39].

an evidentiary hearing on July 2, 2013, and accepted evidence concerning the suppression motion; the parties requested and received additional time for briefing, and both Defendant and the Government provided supplemental briefs. (See Docket Nos. 40-42). Defendant is presently scheduled to go to trial before the Hon. John R. Tunheim on September 23, 2013. (See Order [Docket No. 36]).

## II.      DEFENDANT'S MOTIONS TO DISMISS

### A. Defendant's Motion to Dismiss the Indictment [Docket No. 32]

Defendant Good was indicted as part of "Operation Squarehook," a collaborative effort among officials of the Federal Government, the Leech Lake Band of Chippewa Indians, the Red Lake Band of Chippewa Indians, and the State of Minnesota to investigate and prosecute illegal poaching and marketing of protected fish on the Leech Lake and Red Lake Reservations and in Beltrami, Cass, Clearwater, Itasca, Pennington, and Polk Counties.[2] Defendant Good is one of ten persons who were indicted in four separate Federal cases: United States v. Brown, No. 13-cr-68 (JRT/LIB); United States v. Reyes, No. 13-cr-70 (JRT/LIB); United States v. Bellefy, 13-cr-71 (RHK/LIB); and United States v. Good, 13-cr-71 (JRT/LIB) (collectively, the "Federal prosecutions").[3]

---

[2] This description of Operation Squarehook is derived from **Defendant's Exhibit 1**, which Defendant submitted during the July 2, 2013, motions and evidentiary hearing in support of his Motion to Dismiss for Selective Prosecution.

[3] In United States v. Brown, Defendant Michael D. Brown is identified in the Indictment as an enrolled member of the Leech Lake Band of Chippewa Indians; the Indictment does not indicate whether Defendant Michael J. Nei is an Indian.

In United States v. Reyes, Defendants Jerry A. Reyes, a/k/a/ "Otto Reyes," and Marc L. Lyons are identified in the Indictment as enrolled members of the Leech Lake Band of Chippewa Indians, and Defendant Frederick W. Tibbetts, a/k/a "Bud Tibbetts," is identified in the Indictment as an enrolled member of the White Earth Band of Chippewa Indians; the Indictment does not indicate whether Defendant Alan D. Hemme is an Indian.

The Indictment in United States v. Bellefy does not indicate whether Defendants Larry W. Bellefy, Thomas P. Sumner, or Brian Holthusen are Indians; however, Defendants Sumner and Holthusen identify themselves as enrolled members of the Red Lake Band of Chippewa Indians in their respective motions to dismiss for selective prosecution.

Defendant here first argues that the Federal regulations that form the predicate offense for his Lacey Act prosecution violate his treaty fishing rights and, therefore, are invalid. Additionally, Defendant argues that the Lacey Act does not apply to Indians, and, in the alternative, that even if the Lacey Act applies to Indians, the Government's prosecution of him under the Lacey Act is invalid because the acts that the Indictment alleges he committed, even if true, would merely constitute the lawful exercise of his rights under the Treaty with the Chippewa, 7 Stat. 536 (July 29, 1837) (hereinafter, the "1837 Treaty"), and various other treaties. (See Docket No. 32).[4]

### 1. The Federal regulations concerning commercial fishing on the Red Lake Indian Reservation are valid.[5]

Defendant argues that 25 C.F.R. §§ 242.2 and 242.4 are invalid because they effectively abrogate his treaty guaranteed right to fish on Red Lake. However, Defendant cites no authority, and the Court has found none, for the proposition that the Federal regulations that govern fishing on the Red Lake Indian Reservation or elsewhere in Indian country are unlawful abrogations of Indian fishing rights. In fact, in the only case the Court has found that addresses this particular circumstance, the Ninth Circuit, in United States v. Eberhardt, 789 F.2d 1354 (9th Cir. 1986),

---

The Indictment in United States v. Good does not indicate whether Defendant Larry Good is an Indian; however, he identifies himself as an enrolled member of the Red Lake Band of Chippewa Indians in his motion to dismiss for selective prosecution.

[4] Seven of the ten defendants in the Federal prosecutions have moved for dismissal of the Indictment on the grounds that they were merely exercising their treaty rights, and at least some have sought to incorporate each other's arguments with regard to these motions. (See, e.g., United States v. Brown, No. 13-cr-68(1), Def.'s Supplementary Mem. Supp. Mot. Dismiss Indictment [Docket No. 69], at 1 ("We respectfully . . . join in the arguments filed on behalf of the Red Lake and Whtie Earth defendants in the 'Operation Squarehook' cases.").

Consequently, references in this Report and Recommendation to Defendant's arguments encompass not only those made by Defendant in the present case, but also to those made by defendants in the related cases.

[5] Defendant in the present case does not, himself, explicitly advance this argument, which is only expressly brought by Defendant Sumner. See fn.3, supra. However, because the Lacey Act, itself, does not prohibit any specific action, but instead merely attaches a Federal criminal penalty to actions otherwise prohibited under Federal or tribal law, the Court construes Defendant's argument as also implicitly challenging the validity of the Federal regulation that governs commercial fishing on Red Lake, and which serves as the predicate offense for his alleged Lacey Act violation.

upheld both the Federal regulations at issue and their use as a predicate offense for an alleged Lacey Act violation.

### a. The Ninth Circuit's decision in Eberhardt.

In Eberhardt, two members of the Yurok Indian Tribe were charged with violating the Lacey Act, the predicate offenses being violations of federal regulations governing commercial fishing within the Hoopa Valley Indian Reservation,[6] which was shared by the Hoopa and Yurok Tribes.[7] Id. at 1356. Those regulations allowed eligible Indians to fish for subsistence and ceremonial purposes, but prohibited commercial fishing. Id. at 1357 (citing 25 C.F.R. 250.8(d)-(e) (1984)). The Defendants challenged their prosecution, arguing that the regulations "were invalid as an unauthorized modification or abrogation of their right to take Klamath River fish." Id. In the U.S. District Court for the Northern District of California, the Magistrate Judge granted their motion to dismiss, and, on the Government's appeal, the District Judge affirmed. Id. at 1357-58 (citing United States v. Wilson, 611 F. Supp. 813 (N.D. Cal. 1985), rev'd Eberhardt, 789 F.2d 1354).

The Ninth Circuit reversed holding that the Department of Interior (hereinafter, "Interior") had the authority to implement the regulations and that the regulations did not abrogate treaty rights. Eberhardt, 789 F.2d at 1359-62.

The Eberhardt court first determined that Interior had the authority to enact the regulations, even without an express statutory grant of such authority. "The validity of the [regulation] depends on whether Congress has given Interior express or implied statutory authority to regulate Indian fishing." Id. at 1359. Although the defendants argued that Congress

---

[6] The regulations at issue in Eberhardt were codified at 25 C.F.R. § 250 (1984), but no longer appear in the Code of Federal Regulations.

[7] Subsequently, in 1988, the Hoopa-Yurok Settlement Act, 102 Stat. 2924 (1988) (codified at 25 U.S.C. §§ 1300i et seq.), "divided the Hoopa Valley Reservation into two separate reservations: the Hoopa Valley Reservation and the Yurok Reservation." Short v. United States, 50 F.3d 994, 997 (9th Cir. 1995).

had not expressly granted Interior the authority to regulate fishing on the Hoopa Valley

Reservation, the court found that Congress had delegated to Interior broad authority to manage

Indian tribal resources under 25 U.S.C. §§ 2[8] and 9,[9] and that the U.S. Supreme Court had

"acknowledged Interior's authority to issue fishing regulations under the 'general Indian powers'

conferred by 25 U.S.C. §§ 2, 9."  Eberhardt, 789 F.2d at 1360-61 (citing Washington v.

Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 691 (1979)); see

also United States v. Michigan, 623 F.2d 448, 450 (6th Cir. 1980) (upholding Interior regulations

issued pursuant to 25 U.S.C. §§ 2, 9, governing treaty fishing rights in the Great Lakes).

Additionally, the Eberhardt court found that the regulations "are designed to manage the

fishery for the benefit of the Indians, not to extinguish any reserved tribal fishing rights." 789

F.2d at 1361.  The Court noted that the defendants did not challenge the Hoopa Valley

Reservation fishing regulations in their entirety, but instead only challenged the prohibition

against commercial fishing.  Id. at 1359 (defendants "conceded that Interior has general authority

to regulate Indian fishing.  They challenge none of the other regulatory provisions, such as

restrictions on the type, number, and permissible location of nets, or the catch marking,

reporting, and transportation requirements" (citations to the C.F.R. omitted).).[10]

> **b. Application of Eberhardt to the present case.**

The instant case presents circumstances substantially similar to those in Eberhardt.  As in

Eberhardt, the specific regulations that Defendant in the present case challenges are part of a

comprehensive Federal regulatory scheme that governs fishing on the Red Lake Indian

---

[8] 25 U.S.C. § 2 provides: "The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations."

[9] 25 U.S.C. § 9 provides: "The President may prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs, and for the settlement of the accounts of Indian affairs."

[10] The Eberhardt court declined to reach the question of whether the regulations were arbitrary, capricious, an abuse of agency discretion, or otherwise contrary to law.  789 F.2d at 1362 (citing 5 U.S.C. § 706(2)(A)).

Reservation, where Defendant is a member.  Compare Commercial Fishing on Red Lake Indian

Reservation, 25 C.F.R. § 242 (2013)[11] (Red Lake), with Indian Fishing—Hoopa Valley Indian

Reservation, 25 C.F.R. § 250 (1984)[12] (Hoopa Valley).[13]  In the present case, this comprehensive

regulatory scheme addresses such subjects as the release of unmarketable live fish and the

disposal of unmarketable dead fish, 25 C.F.R. § 242.5; a prohibition on taking certain fish

species during spawning season, 25 C.F.R. § 242.6; a seasonal limit on the total volume of fish

taken during any individual fishing season, 25 C.F.R. § 242.9; and limitations on, and regulations

concerning the use of, fishing equipment, 25 C.F.R. § 242.10.  As in Eberhardt, the specific

regulations at issue in the present case allow eligible Indians to take fish from Red Lake for their

own use, but place restrictions upon commercial fishing.  Compare 25 C.F.R. §§ 242.2, 242.4

(2012) (Red Lake), with 25 C.F.R. § 250.8(d)-(e) (1984) (Hoopa Valley).  Accordingly, this

Court finds that the comprehensive regulatory scheme governing Commercial Fishing on Red

Lake Indian Reservation, codified at 25 C.F.R. § 242, is "designed to manage the fishery for the

benefit of the Indians, not to extinguish any reserved tribal fishing rights."  Eberhardt, 789 F.2d

at 1361.

Although Defendant argues that the specific regulations that he is alleged to have violated

infringe his treaty rights, he does not argue that Interior lacked the authority to promulgate the

Commercial Fishing on Red Lake Indian Reservation regulations.  Even if he did, this Court is

persuaded by the reasoning of the Ninth Circuit's decision in Eberhardt, and by the U.S.

Supreme Court's acknowledgement of Interior's authority to issue Indian fishing regulations,

---

[11] Hereinafter, all references to 25 C.F.R. § 242, and its subsections, are to the 2013 printing of the Code of Federal Regulations.
[12] Hereinafter, all references to 25 C.F.R. § 250, and its subsections, are to the 1984 printing of the Code of Federal Regulations.
[13] The Court takes judicial notice that regulations concerning Commercial Fishing on Red Lake Indian Reservation have been codified in the Code of Federal Regulations since 1938, and appear to have existed in some form since at least 1930.  See Commercial Fishing on Red Lake Indian Reservation, 25 C.F.R. §§ 291, 291.1 n.† (1938).

that Interior does have the authority to promulgate the regulations at issue in the present case. See, for comparison, Eberhardt, 789 F.2d at 1350-61 (citing Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. at 691).

Finally, the Ninth Circuit in Eberhardt wrote that, because the regulations in that case had been promulgated pursuant to the Administrative Procedures Act, they "may be set aside [only] if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 789 F.2d at 1362 (citing 5 U.S.C. § 706(2)(A)); see also Sierra Club v. Clinton, 746 F. Supp. 2d 1025, 1031 (D. Minn. 2010) (Frank, J.) ("The Court must affirm an agency decision unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (quoting 5 U.S.C. § 706(2)(A); and citing Sierra Club v. Envtl. Prot. Agency, 252 F.3d 943, 947 (8th Cir. 2001); and Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)). Defendant here does not argue that the specific regulations at issue in the present case, much less the comprehensive regulatory scheme for Commercial Fishing on Red Lake Indian Reservation, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

     **c.   The District of Minnesota has held that the Federal Government may regulate the exercise of Indian treaty-based usufructuary rights by means of "valid conservation measures" that do not discriminate against Indians.**

The District of Minnesota has twice been presented with the question of whether the Federal Government, by means of properly promulgated agency regulations, may regulate the exercise of usufructuary rights guaranteed by Indian treaties (although neither was in the context of a Lacey Act prosecution). In both instances, involving the same defendant, the court held that the Federal Government could do so.

In United States v. Gotchnik, Nos. 5-94MG-05 and 5-94MG-08 (RLE), 1995 WL 312012

(D. Minn. Mar. 28, 1995) (hereinafter Gotchnik I), defendant David Gotchnik (Mr. Gotchnik)

was charged with possession and use of a snowmobile in the Boundary Waters Canoe Area

Wilderness ("BWCAW"), in violation of 36 C.F.R. § 261.16(a).[14]  Mr. Gotchnik, a member of

the Bois Forte Tribe of Chippewa Indians, argued the any regulation limiting his ability to hunt

in the BWCAW would abrogate his rights to hunt within the ceded territories, guaranteed by the

1854 Treaty with the Chippewa, 10 Stat. 1109 (Sept. 30, 1854).  Gotchnik I, 1995 WL 312012, at

*5.  The court concluded that the prohibition on the use of snowmobiles in the BWCAW did not

"in any meaningful respect[] infringe upon Gotchnik's usufructuary rights that were retained

under the 1854 Treaty."  Id. at *6.

Four years later, Mr. Gotchnik was again in front of the District Court.  United States v.

Gotchnik, Nos. 98-cr-262, 98-cr-302 (ADM/RLE), 57 F. Supp. 2d 798 (D. Minn. 1999)

(hereinafter "Gotchnik II").  This time, he was accused of using a motor-powered canoe in an

area of the BWCAW where such motors were prohibited, in violation of 36 C.F.R. § 261(a).

Gotchnik II, 57 F. Supp. 2d at 800.  Again, Mr. Gotchnik argued that the Federal government

could not limit the exercise of his usufructuary rights—this time, his right to take fish—within

the ceded territory.  Id.  This time, the District Court upheld the regulations as "permissible,

nondiscriminatory conservation measure[s]."  Id. at 803.  The District Court found that the U.S.

Supreme Court had upheld such regulations when imposed by a state in and had "reaffirmed this

principle in its mot recent Indian law decision."  Id. (citing Puyallup Tribe v. Dep't of Game, 391

U.S. 392, 396 (1968) (". . . the manner of fishing, the size of the take, the restriction on

commercial fishing, and the like may be regulated by the State in the interest of conservation . . .

[14] A second, non-Indian, defendant also was charged with a snowmobile violation, but did not assert any treaty-based defense.

.”); and Mille Lacs, 526 U.S. at 524 (“We have repeatedly reaffirmed state authority to impose reasonable and necessary nondiscriminatory regulations on Indian hunting, fishing and gathering rights in the interest of conservation.”)).

The regulations at issue in Gotchnik I and Gotchnik II were enacted pursuant to Congress's express prohibition of the use of motorized vehicles in wilderness areas. See 16 U.S.C. § 1133(c) (generally prohibiting use of motorized vehicles in wilderness areas). However, the lack of any such express authorization in the present case is immaterial, as the Court has already determined that Interior had the authority to enact regulations concerning Commercial Fishing on the Red Lake Indian Reservation. See Part II.B.1.b, supra.

### d. Conclusion.

For the reasons articulated above, the Court finds that Defendant has not met his burden of demonstrating that the regulations are invalid.

### 2. The Lacey Act applies to Indians.

Defendant argues that Congress never intended the Lacey Act to apply to Indians. The Court cannot agree with this argument, which is clearly contrary to binding Eighth Circuit precedent. United States v. Big Eagle, 881 F.2d 539, 540 n.1 (8th Cir. 1989) (hereinafter “Big Eagle II”) (“the Lacey Act, by its terms and definitions, applies to Indian people” (citing 16 U.S.C. § 3371(e) (“The term ‘person’ includes any individual . . . subject to the jurisdiction of the United States”)). Furthermore, the Eighth Circuit's holding in Big Eagle II is consistent with the Ninth Circuit's decision in United States v. Sohappy. 770 F.2d 816 (9th Cir. 1985). Upon a review of the Lacey Act's legislative history, the Ninth Circuit held that Congress intended that the act apply to Indians:

> [T]he overall purpose in subjecting persons who traffic in illegally
> obtained fish to the stiffer Lacey Act penalties was to allow the Federal

Government to provide more adequate support for the full range of laws that protect wildlife.

Indians who traffic in illegal wildlife harm the Lacey Act's goal of wildlife preservation just as much as non-Indian traffickers. . . . To exempt Indians from these penalties would impede attainment of Congress' goal.

Id. at 821 (internal quotations, alternations, and citations to Congressional reports omitted).[15]

Defendant offers no authority—in particular, no binding Eighth Circuit or U.S. Supreme Court authority—to suggest that the Lacey Act does not apply to Indians. Therefore, the Court holds, consistent with Big Eagle II, that the Lacey Act does apply to Indians, and, consequently, that the Indictment is not facially improper.

### 3. The Government's prosecution of Defendant under the Lacey Act does not violate his treaty fishing rights.

Having determined that the Lacey Act applies to Indians, the Court next must determine whether the Government's prosecution of Defendant under the Lacey Act is improper as a punishment for the exercise of his right to fish, as guaranteed by treaties.

#### a. Standard of Review

"A prosecution designed solely to punish a defendant for exercising a valid legal right violates due process." United States v. Leathers, 354 F.3d 955, 961 (8th Cir. 2004) (citing Blackledge v. Perry, 417 U.S. 21, 25-26 (1974); United States v. Graham, 323 F.3d 603, 606 (8th Cir. 2003)). A defendant may demonstrate that he was prosecuted for an improper motive by either direct or circumstantial evidence. Id. (citing United States v. Beede, 974 F.2d 948, 951 (8th Cir. 1992)). However, "[i]t is the defendant's burden to show that the prosecution was brought in order to punish the defendant for the exercise of a legal right." Id. (citing United

---

[15] See also United States v. Big Eagle, 684 F. Supp. 241, 244 (D.S.D. 1988) ("The defendant next contends that the Court lacks subject matter jurisdiction to hear this action because the Lacey Act does not apply to Indians. The only United States Court of Appeals to decide this issue has held that the Lacey Act does apply to Indians. This Court is persuaded that the decision of the Ninth Circuit in United States v. Sohappy is correct and that the discussion of the issues raised in Sohappy is dispositive for purposes of deciding this motion" (citations omitted).).

States v. Kriens, 270 F.3d 597, 602 (8th Cir. 2001)).  The Eighth Circuit has repeatedly described the Defendant's evidentiary burden in proving an improper motive for prosecution as "a heavy one."  Id. (citing United States v. Kelley, 152 F.3d 881, 885-86 (8th Cir. 1998)).

**b. Discussion**

The Court begins with the issues that are not in dispute.  First, in the present case, neither party disputes that the Chippewa Indians[16] in Minnesota generally have a right to fish on tribal land and within the territory ceded pursuant to the 1837 Treaty.  "As a general rule, Indian tribes have 'the power to manage the use of their territory and resources both by members and nonmembers.'"  United States v. Big Eagle, 684 F. Supp. 241, 245 (D.S.D. 1988) (hereinafter "Big Eagle I") (citing New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 335 (1983), aff'd Big Eagle II, 881 F.2d 539 (8th Cir. 1989), reh'g denied 1989 U.S. App. LEXIS 13872 (8th Cir. Sept. 8, 1989) (en banc), cert. denied 493 U.S. 1084 (1990).  "Although some treaties provide expressly that Indians have exclusive hunting, fishing, and gathering rights on their reservations, it is not necessary that the rights be referred to as "exclusive" in the treaty, or even that they be expressly mentioned.  Exclusive on-reservation hunting, fishing, and gathering rights are implied from the establishment of a reservation for the exclusive use of a tribe, whether the reservation was set aside by executive order, statute, agreement, or treaty."  1-18 Cohen's Handbook of Federal Indian Law § 18.03 (footnotes omitted).  "Such treaty rights can be asserted by . . . an individual member of the Tribe."  United States v. Dion, 476 U.S. 734, 738 n.4 (1986).

Additionally, in the present case neither party disputes that the Lacey Act is a Federal statute of general applicability.  Both Defendant and the Government acknowledge that "'federal laws of general applicability 'are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question.'""  United

---

[16] Also known as Ojibwe or Anishinabe.

States v. Wadena, 152 F.3d 831, 846 (8th Cir. 1998) (quoting Sohappy, 770 F.2d at 819 (9th Cir. 1985) (quoting, in turn, United States v. Burns, 529 F.2d 114, 117 (9th Cir. 1975))).  If a court determines that there is a treaty right that exempts Indians from the operation of a Federal statute of general applicability, the court next asks whether that treaty right was abrogated by Congress. A court generally will find that Congress has abrogated a treaty right only where there is explicit statutory language doing so.  Dion, 476 U.S. at 738-39 (collecting cases).

The first question, then, is not, as Defendant urges, whether the Lacey Act abrogates his treaty right to take fish on the Red Lake Indian Reservation—a right that the Government acknowledges Defendant has.  Rather, the Court must begin with this question: Does Defendant's treaty right exempt him from the operation of the Lacey Act.

### i. The case law, both in the Eighth Circuit and elsewhere, supports the Government's assertion that Defendant's treaty right to fish does not exempt him from operation of the Lacey Act.

#### (a) Sohappy and Stone

The Ninth Circuit, in Sohappy, was the first court to address this question in detail, and it found that the defendants' treaty rights *did not* exempt them from the operation of the Lacey Act. 770 F.2d at 820.  The defendants in Sohappy were convicted of violating the Lacey Act by catching and selling fish in violation of tribal and state law.  Id. at 817.  They appealed, arguing "that federal prosecution of Indians for violations of tribal fishing law violates Indian sovereignty and Indian treaty reserved fishing rights."  Id.

The Ninth Circuit rejected those arguments.  With regard to the argument that a Lacey Act prosecution would violate Indian tribal sovereignty, the court held that "Indian sovereignty is necessarily limited and must not conflict with the overriding sovereignty of the United States." Id. at 819 (internal citation and quotation omitted).  Additionally, the court held that a Lacey Act

prosecution does not impair Indian tribal sovereignty, but rather "supports tribal laws by authorizing federal penalties for violations." Id. at 819-20.[17] Furthermore, it held that a Lacey Act prosecution does not violate reserved fishing rights because "the Indians do *not* have any treaty reserved right to exercise *exclusive* jurisdiction over such fishing matters. Nor is there "specific language [in the treaties] . . . 'purporting to exempt Indians from the laws of general applicability throughout the United States.'" Id. at 820 (quoting Burns, 529 F.2d at 117 (emphasis and alterations in Sohappy).

The Eighth Circuit expressly adopted this reasoning, albeit not in a Lacey Act case, in United States v. Stone. 112 F.3d 971 (8th Cir. 1997). In Stone, the defendant, an enrolled member of the White Earth Band of Chippewa Indians, was convicted of violating the Airborne Hunting Act[18] on the White Earth Indian Reservation. 112 F.3d at 972. He appealed, arguing in part that "the treaties between the Chippewa Indians and the United States vested the tribes with jurisdiction over hunting, fishing and wild rice gathering and that therefore he cannot be federally prosecuted for hunting on the reservation." Id. at 973. The Eighth Circuit, citing Sohappy with approval, rejected this argument:

> As the Ninth Circuit pointed out, however, despite the fishing rights contained in a treaty, "Indians do not have any treaty reserved right to exercise exclusive jurisdiction over such fishing matters." United States v. Sohappy, 770 F.2d 816, 820 (9th Cir. 1985) (upholding federal jurisdiction over an Indian on the reservation under federal statute criminalizing transporting, selling, or acquiring fish). "Indian sovereignty is 'necessarily limited' and must not conflict with the overriding sovereignty of the United States." Id. at 819. Federal laws of general applicability "are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question." Burns, 529 F.2d at 117; Sohappy, 770 F.2d at 820 (quoting Burns, 529 F.2d at 117). . . . [A]s in Sohappy, federal jurisdiction under the Airborne

---

[17] Although the predicate offenses to the Lacey Act prosecution in Sohappy were violations of tribal and state wildlife regulations, 770 F.2d at 817, the Ninth Circuit later held that validly enacted Federal regulations concerning wildlife conservation in Indian country also form a legitimate basis for a Lacey Act prosecution. See United States v. Eberhardt, 789 F.2d 1354, 1359-60 (9th Cir. 1986).

[18] 16 U.S.C. § 742j-l.

Hunting Act is not "disruptive of tribal authority, for rather than overturning basic tribal regulations, it supports the tribal laws by authorizing federal penalties for violations," and its enforcement against an Indian on Indian land is proper. Id. at 819-20.

Stone, 112 F.3d at 973-74.

Defendant argues that neither Sohappy nor Stone controls the present case. First, Defendant argues that Sohappy is inapplicable, because the treaty at issue in that case provided for a tribal "right to take fish at all 'usual and accustomed places' [which] was not exclusive but was to be shared 'in common with the citizens of the Territory.'" 770 F.2d at 819. In contrast, Defendant argues that the Chippewa Indians retain exclusive fishing rights on their reservations. The Defendant misses the point. The issue described by the court in Sohappy was whether the treaty reserved exclusivity as to "*jurisdiction over enforcement* of tribal fishing law against Indians." 770 F.2d at 818. Defendant has provided no evidence of any treaty language, or any other authority, that reserves to the Chippewa Indians exclusive jurisdiction—to the exclusion of the United States—over enforcement of on-reservation fishing regulations.

Defendant also argues Stone is inapplicable because it did not concern fishing rights. The Court is not persuaded. Although Stone was prosecuted for a hunting violation and not a fishing violation, the defendant's argument in that case was substantially the same as the Defendant's argument in the present case: that his Federal prosecution violated the usufructuary rights he was guaranteed by one or more treaties. Defendant offers no reason, and the Court can think of none, why the distinction between hunting and fishing should be material.

### (b) **Big Eagle I** and **II.**

Three years after the Ninth Circuit decided Sohappy, the U.S. District Court for the District of South Dakota denied a motion to dismiss that raised substantially the same questions at issue in the present case. In Big Eagle I, the defendant was an enrolled member of the Crow

Creek Sioux Tribe, and was charged with a Lacey Act violation, the predicate offense being a violation of the fishing regulations contained in the Lower Brule Sioux Tribe's Wildlife Management Code. 684 F. Supp. at 242-43. The defendant argued that the Fort Laramie Treaty of 1868, 15 Stat. 635 (Apr. 29, 1968), guaranteed him a right to fish where he did. 684 F. Supp. at 244. The court concluded that the exercise of such a right could be regulated either by lawfully enacted tribal regulation, or by its explicit abrogation under Federal law. Id. at 246 ("Neither the Lacey Act nor the Lower Brule Wildlife Management Code 'takes away the rights of Indians to fish in the Missouri River,' as the defendant argues. Rather, Indians retain the right to fish in accordance with tribal regulations except as these rights may be expressly abrogated by federal law.").

Upon a review of various Sioux treaties, the Big Eagle I Court concluded that those treaties "may be construed to authorize regulation of fishing by the Indians within each reservation," and that various Sioux tribes (including the Lower Brule) had enacted "their own fishing regulations. Id. at 245. Because the Lower Brule Sioux Tribe had enacted regulations governing the exercise of treaty rights within the Lower Brule Reservation, and because those regulations governed the defendant's actions, and because the defendant's violation of those regulations precipitated his prosecution under the Lacey Act, that prosecution did not constitute a *Federal* abrogation of his treaty rights. Id. at 244-46.[19]

### (c) **Eberhardt** and **Gotchnik I** and **II**.

As articulated in Part II.A.1, supra, the Ninth Circuit in Eberhardt, 789 F.2d 1354, held that Federal regulation of on-reservation fishing pursuant to the Department of Interior's responsibility to manage tribal resources does not abrogate the tribe's treaty fishing rights. Cf.

---

[19] Although the Eighth Circuit did not specifically address this argument in Big Eagle II, it did affirm the District Court's denial of the defendant's motion to dismiss.

Mille Lacs, 526 U.S. at 204 ("this Court's cases have also recognized that Indian treaty-based usufructuary rights do not guarantee the Indians 'absolute freedom' from state regulation" (citation omitted)); accord Gotchnik I, 1995 WL 312012, and Gotchnik II, 57 F. Supp. 2d 798.

### (d) Defendant presents no case law in which a court has held that an Indian's treaty rights exempt him from operation of the Lacey Act.

Defendant presents no authority, and this Court has found none, holding that an Indian's treaty rights exempt him from operation of the Lacey Act. Instead, Defendant relies on cases that only generally address tribal usufructuary rights and cases holding that certain Federal prosecutions under acts other than the Lacey Act abrogated Indian treaty rights.

Defendant does not specifically address the rationale of Big Eagle I, but instead argues that Sohappy, Stone, and Big Eagle (presumably both I and II) were effectively reversed by the U.S. Supreme Court's decision in Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172 (1999). However, Mille Lacs has no bearing on the present case, for two reasons: First, Mille Lacs did not, as Defendant suggests, expand the Indians' *on-reservation* usufructuary rights that were addressed in Stone, but instead confirmed that the Chippewa Indians reserved rights to hunt, fish, and gather *off-reservation* in the "ceded territory." 526 U.S. at 204. Defendant is charged with an on-reservation offense.[20] Thus, Mille Lacs does not apply.

Second, Mille Lacs held that treaties limited the *State's* authority to infringe Chippewa Indians' usufructuary rights—it says nothing about the *Federal Government's* authority to prosecute pursuant to a law of general applicability:

> [T]he 1837 Treaty gave the Chippewa the right to hunt, fish, and gather in the ceded territory *free of territorial, and later state, regulation*, a privilege that others did not enjoy. Today, *this freedom from state regulation curtails the State's ability to regulate hunting, fishing, and gathering by the Chippewa in the ceded lands*.

---

[20] The Indictment alleges that Defendant violated 25 C.F.R. §§ 242.2 and 242.4, which govern "on the Red Lake Indian Reservation."

Id. (emphasis added).  "The federal government can regulate fishing concurrently with the Indian tribes in the interest of conservation."  Big Eagle, 684 F. Supp. at 244 (citing Sohappy, 770 F. Supp. at 819); see also Stone, 112 F.3d at 973-74.

Defendant also urges the Court to follow United States v. White, 508 F.2d 453 (8th Cir. 1974).  In White, the defendant, a member of the Red Lake Band of Chippewa Indians, was seen shooting a bald eagle on the Red Lake Indian Reservation, and was charged with unlawful taking under the Bald and Golden Eagle Protection Act (the "BGEPA"), 16 U.S.C. § 668(a).  White, 508 F.2d at 454.  The District Court dismissed on the grounds that the defendant was legally exercising his treaty guaranteed right to hunt on the reservation, and the Eighth Circuit affirmed on the same grounds.  Id. at 454, 457.  In particular, the Eighth Circuit held that Congress, in enacting the BGEPA, had not explicitly abrogated Indian treaty rights to hunt eagles and, therefore, that Defendant was legally exercising his hunting right.

However, prosecution under the BGEPA, unlike the Lacey Act, is not premised upon a predicate violation of a Federal regulation concerning wildlife protection in Indian country.  Thus, in White the court was presented only with the question of whether the BGEPA abrogated the defendant's treaty right.

In the present case, the Court need not reach the question of whether Defendant's treaty right to fish was abrogated by the Lacey Act, because the Court finds that the the Federal regulations governing fishing on Red Lake legitimately limit the scope of this right, such that Defendant's right to fish does not excuse him from the operation of the Lacey Act.  See Wadena, 152 F.3d at 846 (Federal statute of general applicability applies to Indians unless treaty right *excuses them from operation of the statute*, or the right has been explicitly abrogated).

### ii.  Summary

The validity of the federal regulations that govern fishing on the Red Lake Indian Reservation "depends on whether Congress has given Interior express or implied statutory authority to regulate Indian fishing."  Eberhardt, 789 F.2d at 1359.  The regulations codified at 25 C.F.R. § 242, which Defendant is alleged to have violated, are part of a comprehensive regulatory scheme governing Commercial Fishing on Red Lake Indian Reservation.  Such regulations "promulgated by Interior pursuant to its responsibilities as trustee to preserve and protect Indian resources" are within Interior's statutory authority under 25 U.S.C. §§ 2 and 9.  Eberhardt, 789 F.2d at 1359-60.  Additionally, both the Eighth and Ninth Circuits have upheld Lacey Act prosecutions against treaty-rights defenses, and Defendant's attempts to distinguish Sohappy, Stone, and Big Eagle are unavailing.  Therefore, applying the reasoning in those cases, the Court finds that although Defendant generally has a right to fish guaranteed by the various Chippewa Indian treaties, that right is (1) subject to lawful regulation by the Federal Government, and (2) the Federal regulations that form the predicate offense for Defendant's Lacey Act prosecution are valid regulations.

Accordingly, Defendant's treaty right does not exempt him from the operation of the Lacey Act and its incorporation of Federal regulations.  Because Defendant's treaty right does not exempt him from the operation of the Lacey Act, a Federal statute of general applicability, the Court need not determine whether Congress explicitly abrogated that treaty right.  See Wadena, 152 F.3d at 846.

While "[a] prosecution designed solely to punish a defendant for exercising a valid legal right violates due process," Leathers, 354 F.3d at 961, in the present case, Defendant has not met his burden of showing that the right he asserts—his treaty-based right to fish on the Red Lake

Indian Reservation—exempts him from the operation of the Lacey Act. Consequently, the Court recommends that Defendant's Motion to Dismiss, [Docket No. 32], be **DENIED**.

## B. Defendant's Motion to Dismiss the Indictment Due to Selective Prosecution, or for Additional Discovery [Docket No. 30]

Defendant Good alleges that he is a victim of selective prosecution and moves for dismissal, or, in the alternative, for additional discovery into the alleged selective prosecution. (See Docket No. 30).

### 1. Standard of Review

"In order to make a prima facie case of selective prosecution, [a defendant] must show: (1) people similarly situated to him were not prosecuted; and (2) the decision to prosecute was motivated by a discriminatory purpose." United States v. Hirsch, 360 F.3d 860, 864 (8th Cir. 2004) (citing United States v. Perry, 152 F.3d 900, 903 (8th Cir. 1998)). The defendant "has the burden of proving the government engaged in selective prosecution." Id. (citing United States v. Kelley, 152 F.3d 881, 885 (8th Cir. 1998)). "The 'evidentiary burden is a heavy one.'" United States v. Peterson, 652 F.3d 979, 981 (8th Cir. 2011) (quoting United States v. Leathers, 354 F.3d 955, 961-62 (8th Cir. 2004)).

A defendant seeking discovery regarding his selection prosecution claim "must present some evidence that tends to show the existence of both elements." United States v. Perry, 152 F.3d 900, 903 (8th Cir. 1998) (citing United States v. Armstrong, 517 U.S. 456, 468-69 (1996)). "The justifications for a rigorous standard for the elements of a selective prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such claim." Armstrong, 517 U.S. at 468; see also United States v. Venable, 666 F.3d 893, 900 (4th Cir. 2012) ("Because discovery imposes high costs on the government, the standard for obtaining discovery in support of a selective prosecution claim is only slightly lower than for a dismissal of the indictment;

rather than presenting clear evidence, the 'defendant must produce 'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent" (quoting <u>United States v. Olvis</u>, 97 F.3d 739, 743 (4th Cir. 1996) (quoting, in turn, <u>Armstrong</u>, 517 U.S. at 470))).

### 2. Facts

Defendant was indicted as part of "Operation Squarehook," a collaborative effort among officials of the Federal Government, the Leech Lake Band of Chippewa Indians, the Red Lake Band of Chippewa Indians, and the State of Minnesota to investigate and prosecute illegal poaching and marketing of protected fish on the Leech Lake and Red Lake Reservations and in Beltrami, Cass, Clearwater, Itasca, Pennington, and Polk Counties. (Def.'s Ex. 1).[21]

Defendant Brown is one of ten persons who were indicted in four separate Federal cases. In each of these Federal prosecutions, the government has alleged violations sufficient to invoke criminal penalties, subjecting the Defendants to a potential fine of up to $20,000.00, and/or a potential prison sentence of up to five years. Of the ten individuals charged in these separate Federal prosecutions, four are identified in the various indictments as Indians and three others self-identify as Indians in various pleadings.[22]

Defendant proffers that State prosecutors in six counties have charged a total of twenty-one persons with various misdemeanor and gross misdemeanor charges. (Def.'s Ex. at 1). Defendants in the State prosecutions are subject to a possible fine of not less than $3,000.00 and not more than $10,000, and/or a potential jail sentence of not less than ninety days and not more

---

[21] The items within Defendant's Exhibit are not individually numbered. They consist of the following:
- **At 1**: Minnesota Dep't Natural Res., Operation Squarehook – State charges by county (undated).
- **At 2-4**: Press Release, U.S. Attorney's Office, District of Minnesota, Ten Indicted In Connection With Illegal Poaching of Walleye On Leech Lake And Red Lake (April 10, 2013).
- **At 5-7**: Minnesota Dep't of Natural Resources, "Operation Squarehook: Investigation of illegal sales of game fish results in more charges," <u>Brainerd Dispatch</u>, April 15, 2013 (printed from internet).
- **At 8-10**: Bill Hudson, "31 charged As DNR Nets Walleye Poaching Ring," WCCO, April 15, 2013 (printed from internet).

[22] For the information in this paragraph, <u>see</u> fn.3, <u>supra</u>.

than one year.  <u>See</u> Minn. Stat. §§ 97A.301, 97A.325.  There is no evidence in the record offered by the movant identifying any of the defendants in the State prosecutions, stating one way or the other definitively whether any of them are Indian, or suggesting that the factual circumstances in the State prosecutions are substantially identical to those of the present case.

### 3.  Discussion

In moving to dismiss on the basis of an allegation of selective prosecution, Defendant has the burden of proving both that persons similarly situated to him were not prosecuted, and that the prosecution decisions were made with a discriminatory purpose or intent.  <u>Hirsch</u>, 360 F.3d at 864.  Because, on the present record, Defendant has shown no evidence of either necessary factor in order to meet his initial burden, he has failed to demonstrate that he is entitled to dismissal of the Indictment or that he should be entitled to any additional discovery on the subject.

### a.  Defendant has not shown that he was treated differently from similarly situated persons.

First, Defendant has failed to identify any similarly situated persons who were **<u>not</u>** prosecuted.  "Defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them."  <u>Venable</u>, 666 F.3d at 900-01 (citing <u>Olvis</u>, 97 F.3d at 744).  Defendant appears to argue solely and conclusorily that the twenty-one persons subject to the State prosecutions are similarly situated to him.  Presumably Defendant contends that the State defendants are similarly situated on the sole basis that they may have been identified in the same Operation Squarehook investigation.[23]  But there is little, if any, evidence in the present record

---

[23] The precise contours of Defendant's argument are not entirely clear, because he does not identify the *specific* persons he believes are similarly situated to himself.  Defendant appears to argue that the twenty-one persons prosecuted by the State are the similarly situated persons; thus, he does not argue that the similarly situated persons were *not prosecuted*, but, rather, argues that those persons were *prosecuted by the State and not the Federal government*, and, as a result, were subjected to potentially lesser penalties than he.

that those persons are, in fact, similarly situated to Defendant.  For example, the Lacey Act makes it illegal "to import, export, transport, sell, receive, acquire, or purchase any fish . . . taken, possessed, transported, or sold *in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law*."  16 U.S.C. § 3372(a)(1) (emphasis added). Defendant has not demonstrated that any of the subjects of the State prosecutions—or any other person he conclusorily asserts may be similarly situated to himself—violated any Federal or Tribal law or regulation, as opposed to violating only State law.

In fact, for a Federal prosecutor deciding whether to prosecute two persons, the mere fact that a state authority has elected to prosecute one of them may be a "legitimate prosecutorial factor" serving two distinguish the two.  Id. at 901.

Because Defendant has failed to meet his threshold burden to show clear evidence, much less any credible evidence, to demonstrate that he was treated differently from other similarly situated persons—or even that there *are* any persons similarly situated to Defendant for purposes of the present case—he has failed to show selective prosecution.

> **b.  Even if Defendant had identified similarly situated persons <u>and</u> shown that he was treated differently from them, he nevertheless has failed to demonstrate that any such differentiation was the result of a discriminatory improper motive.**

Defendant argues that he and other Indians were subjected to Federal prosecution, while non-Indians were instead subjected only to State prosecution.  (See Mot. Dismiss Selective Prosecution [Docket No. 30]).  He alleges that this alone is evidence of a racially discriminatory motive in the federal charging decisions.  (Id.).  However, in addition to his previously addressed failure to demonstrate even some credible evidence that the defendants in the State prosecutions actually *are* similarly situated to him,[24] Defendant also fails to demonstrate any evidence in the

---

[24] See Part II.B.3.a, supra.

record to show beyond mere allegation that any charging differentiation is the result of improper motive.

Defendant appears to start from the flawed premise that any distinction in the prosecutions of Indian tribal members and non-Indians is necessarily per se an impermissible "racial" distinction. In fact, the federal courts have repeatedly held that treating Indian tribal members differently from non-Indians for incidents arising in Indian country does not violate either due process or equal protection. See, e.g., United States v. Antelope, 430 U.S. 641, 646-47 (1977) (holding that "respondents were not subjected to federal criminal jurisdiction because they are of the Indian race but because they are enrolled members of the Coeur d'Alene Tribe. We therefore conclude that the federal criminal statutes enforced here are based neither in whole nor in part upon impermissible racial classifications."); Fisher v. District Court, 424 U.S. 382, 390 (1976) (in civil case, "we reject the argument that denying [the Indian plaintiffs] access to the Montana courts constitutes impermissible racial discrimination. The exclusive jurisdiction of the Tribal Court does not derive from the race of the plaintiff but rather from the quasi-sovereign status of the Northern Cheyenne Tribe under federal law."); United States v. Aanerud, 893 F.2d 956, 960 (8th Cir. 1990) (upholding prosecution of non-Indians for harvesting leeches on the White Earth Reservation against selective prosecution challenge because "members of the White Earth Band and non-members are simply not similarly situated with regard to their respective rights to trap leeches within the confines of the Reservation.")

Defendant also fails to prove that there is any "racial" distinction between himself and the other Indian tribal member Defendants in the four separate Federal prosecutions, on the one hand, and the subjects of the State prosecution on the other hand. Defendant offers only a news report that states that "[t]en members of the Red Lake and Leech Lake bands are charged in

Federal Court," while "another 21 non-tribal buyers and sellers are now facing state charges." (Def.'s Ex. at 9).[25]  The superficial, perfunctory news article representation of the "racial" make-up of the Defendants in the Federal prosecutions compared to the State prosecutions on which Defendant relies is at odds with the evidence in the record which shows only seven of the ten Federal defendants in the four separate Federal prosecutions are identified as Indian.  See fn. 3, supra.  If the news report upon which Defendant relies does not even accurately reflect whether all, or only some, of the Defendants in the four separate Federal prosecutions are Indian, then the same article cannot be a credible source of evidence as to accurately reflect whether all, or only some, of the subjects of the State prosecutions are non-Indian.  Defendant has the burden of proving selective prosecution, and he might have examined the actual case files of the defendants in the State prosecutions to ascertain whether there is evidence to demonstrate their racial makeup.  However, Defendant has not done so on the present record.

Finally, even assuming, *arguendo*, that Defendant had demonstrated that there was a clear racial distinction between himself and other Defendants in the Federal prosecutions, and those persons subject to the State prosecutions, "'[t]o establish discriminatory effect in a race case, the claimant must show people of another race violated the law and the law was not enforced against them.'"  See United States v. Hare, 308 F. Supp. 2d 955, 991 (D. Neb. 2004) (with regard to selective enforcement defense) (quoting United States v. Bell, 86 F.3d 820, 823 (8th Cir. 1996)).  Defendant has not even demonstrated that any of the subjects of the State prosecutions violated the Lacey Act and were not prosecuted in Federal court, and, therefore, Defendant has failed to demonstrate any actual discriminatory effect on the present record.

---

[25] See also Def.'s Ex. at 6 (describing Defendants in the federal prosecutions as "10 tribal members").

Defendant states that "at least eight of the ten federal defendants are Native American, and are enrolled members of an Indian tribe in the state of Minnesota."  (Mot. Dismiss Selective Prosecution [Docket No. 30] at 1).  Defendant does not account for the discrepancy between his count of eight Indian defendants, and the seven who are identified as Indian in the record.

Because Defendant Good has failed to show either of the two material elements necessary to dismiss an indictment on the basis of selective prosecution, the Court recommends that his Motion to Dismiss Indictment due to Selective Prosecution, or for Additional Discovery, [Docket No. 30], be **DENIED**.

III.   **DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND ANSWERS [Docket No. 31]**

Defendant argues that he was in custody when he was interviewed by law enforcement on July 23, 2011, and that his statements made during that interview must, therefore, be suppressed because he was not advised of his <u>Miranda</u> rights.[26]  In the alternative, Defendant argues that officers continued to question him after he invoked his right to assistance of counsel.

A.  **Facts**[27]

The interview at issue took place on the morning of July 23, 2011, immediately after Defendant allegedly sold fish to an undercover officer along County Road 2 near Gully, Minnesota.  Three other officers, U.S. Fish and Wildlfe Service Special Agent Richard Grosz ("SA Grosz"), Lieutenant Tom Provost ("Lt. Provost") of the Minnesota Department of Natural Resources ("MDRN"), and MDNR Conservation Officer Rick Reller ("CO Reller") (collectively, the "interviewing officers"), approached Defendant immediately thereafter in another vehicle.  The encounter with Defendant was recorded, beginning several minutes before the officers actually interviewed Defendant.

---

[26] <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)
[27] The facts in this Part are derived from the testimony of United States Fish and Wildlife Service Special Agent Richard Grosz ("SA Grosz"), and from **Government's Exhibit 1**: A recording of the interview that SA Grosz conducted with Defendant on July 23, 2011, which the Government offered, and the Court accepted into evidence, for the purposes of this motion.

Approximately 11 minutes into the recording, upon receiving a pre-arranged signal from the undercover officer, the interviewing officers pull up close to Defendant's vehicle, then exit their own vehicle and say to Defendant: "Federal agent, put your hands where I can see them, right now, get 'em up." Defendant complies, and the interviewing officers conduct a pat-down search of Defendant. The interviewing officers identify themselves, and SA Grosz says that he would like to ask Defendant some questions. SA Grosz counts the cash seized from Defendant and says he is going to retain the cash, after which the following exchange takes place:

| | |
|---|---|
| **SA Grosz**: | You are not under arrest. I would like to have a chance to talk with you right now, though. Obviously we've got some things I'd like to talk with you about, get squared away. |
| **Defendant**: | Alright. |
| **SA Grosz**: | Do you have a problem talking to me? |
| **Defendant**: | No. |
| **SA Grosz**: | OK. I appreciate your honesty, alright? This is not the best place, obviously, to park for safety reasons. |
| **Defendant**: | Yeah. |
| **SA Grosz**: | Last thing we want to do is to have someone hit your vehicle or hit my vehicle . . . |
| **Defendant**: | Yeah . . . |
| **SA Grosz**: | . . . or hit one of us. |
| **Defendant**: | . . . Yeah. |
| **SA Grosz**: | So, would it be possible for one of these officers to start that vehicle while you're with me, go back into town and find a parking lot, spot, . . . |
| **Defendant**: | Sure. |
| **SA Grosz**: | . . . to talk? That'd be OK with you? |

| | |
|---|---|
| **Defendant**: | Sure. |

| | |
|---|---|
| **SA Grosz**: | OK. Alright. I'll let you go ahead. I want to let you know you're not under arrest. [Unintelligible] . . . parking lot over here. You don't have to talk to us, [unintelligible] OK? You're not under arrest now, you're not under arrest when you're done. I just want you to understand that. Right now, you're cooperating with us, and we just want to get some things squared away. |

| | |
|---|---|
| **Defendant**: | Alright. |

| | |
|---|---|
| **SA Grosz**: | Are you comfortable with that? |

| | |
|---|---|
| **Defendant**: | Sure. |

At this point, Defendant got into the interviewing officers' vehicle with SA Grosz and Lt. Provost SA Grosz drove, with Defendant in the front seat and Lt. Provost in the back seat, while CO Reller drove Defendant's vehicle. They made small talk for a few minutes, while driving through the town of Gully. SA Grosz asks if there is a good place to park and talk in the town of Gully, and Defendant responds that he does not care where they stop, describing Gully as "a pretty quiet town." SA Grosz then says he intends to drive north of town, and Lt. Provost suggests a county road about half a mile up the road. SA Grosz pulls off the road in a field north of town.

SA Grosz introduces himself again, and begins to interview Defendant. The two talk generally about fishing for some time, and SA Grosz attempts to get Defendant to name persons who bought fish or sold fish illegally. Defendant says that he will not inform on others or "set somebody up," the way he said he had been set up. Approximately 1 hour and 6 minutes into the recording, the following exchange takes place:

| | |
|---|---|
| **SA Grosz**: | Larry, you've been around the block. Come on, now, I mean, let's get this out on the table. Let me put it to you this way. |

| | |
|---|---|
| **Defendant**: | Let's go to court. Let's get a lawyer. Let me, let me get a lawyer. Then, then, let me see what I can say with a lawyer around. |

| | |
|---|---|
| **SA Grosz**: | Ultimately when these people point . . . |
| **Defendant**: | Read me my rights and then we'll go to jail. And . . . |
| **SA Grosz**: | You're, you're not under arrest. |
| **Defendant**: | . . . then I'll bail myself out. |
| **SA Grosz**: | It, it's like I already told you, you're not under arrest. You can go at any time, alright? You're not under arrest. |
| **Defendant**: | Well then let's go. Let me go then. I've got nothing to say to you guys. You guys—so you caught me, you caught me. I was dumb enough to fall into your trap. But I, I, like I said, I never caught any of that fish that you guys have. |

After this exchange, SA Grosz continued to question Defendant after this exchange.

Approximately 1 hour and 52 minutes into the recording, the following exchange takes place:

| | |
|---|---|
| **Defendant**: | Well, let's go. Let's get, let's get this over with. I want to get out of jail and go home. I gotta make it to work at 10 o'clock tonight. |
| **SA Grosz**: | Once again, partner, you're not going to jail today, alright? That doesn't happen. Like I told you before, you're not under arrest. |
| **Defendant**: | Let's go, then. Let me go then. |
| **SA Grosz**: | Well, I just wanted to have a chance along with [Lt. Provost] to sit down and talk with you, and try to get this stuff out in the open. |

SA Grosz again continued to question Defendant after this exchange, including additional attempts to get information about who Defendant might have sold fish to. Approximately 2 hours and 6 minutes into the interview, SA Grosz offers Defendant "one last chance" to provide names, and Defendant again refuses. Only at this point, despite two previous requests by Defendant to be let go, does SA Grosz return Defendant's driver's license and vehicle keys to him, and allow Defendant to leave.

The recording runs a total of approximately 2 hours and 12 minutes.

**B. Defendant was in custody during the interview on July 23, 2011, and because he was not advised of his <u>Miranda</u> rights, his statements made during that interview should be suppressed.**

### 1. Standard of Review

"[<u>Miranda</u>] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." <u>United States v. Chipps</u>, 410 F.3d 438, 445 (8th Cir. 2005) (citing <u>Miranda</u>, 384 U.S. at 444). <u>Miranda</u> warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994) (quoting <u>Miranda</u>, 384 U.S. at 444). However, law enforcement officers "are not required to administer <u>Miranda</u> warnings to everyone whom they question." <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977). "<u>Miranda</u> warnings are required only where there has been such a restriction on a person's freedom as to render him in custody." <u>Id.</u>

The Eighth Circuit considers six (6) factors when determining whether a suspect is in custody:

> (1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

<u>United States v. Sanchez</u>, 676 F.3d 627, 630 (8th Cir. 2012) (quoting <u>United States v. Griffin</u>,

922 F.2d 1343, 1349 (8th Cir. 1990)).  "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning.  Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody."  United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002).  Those factors, however, are not exclusive; "[t]he analysis depends upon a review of the totality of circumstances, and '[t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview.'"  Sanchez, 676 F.3d at 630-31 (quoting United States v. Aldridge, 664 F.3d 705, 711 (8th Cir. 2011)).

The ultimate determination is based on the totality of the circumstances, with none of the above factors being dispositive, and a particularly strong showing on one factor may compensate for a deficiency on another factor.  Griffin, 922 F.2d at 1347.  The key inquiry is whether there was a formal arrest or restraining of a defendant's movement to the degree associated with a formal arrest.  Stansbury, 511 U.S. at 322.  "In answering this question, we look at the totality of circumstances while keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'"  United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (quoting Stansbury, 511 U.S. at 322-23), cert. denied LeBrun v. United States, 543 U.S. 1145 (2005)).  The Court must examine "both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody."  Axsom, 289 F.3d at 500 (internal quotation marks omitted).

### 2.  Discussion

Based on the present record in this case, the totality of the circumstances indicates that

Defendant was in custody when he was questioned by the interviewing officers on July 23, 2011. Consequently, the interviewing officers were required to provide the Defendant with a rights warning consistent with <u>Miranda</u>; their failure to do so means that this Court must recommend that any statements Defendant made during that July 23, 2011, interview be suppressed.

The first factor does not mitigate against a finding of custody in the preset case. The interviewing officers did advise Defendant early on that he was not under arrest and that he was free to end the interview and leave. Ordinarily, this would be sufficient to weigh heavily against a finding of custody. <u>Sanchez</u>, 676 F.3d at 631 ("The first <u>Griffin</u> factor weighs heavily in favor of noncustody when the officers clearly inform a suspect that [he] is free to leave or decline questioning" (citations omitted).). However, the interviewing officers' actions directly contradict their statements. Defendant twice told the interviewing officers unequivocally that he wanted to end the interview by saying: "Let me go then." However, both times, the interviewing officers unilaterally persisted in their questioning. Although the interviewing officers technically met the requirements of this factor merely by *advising* defendant at their initial encounter that he may end the interview, the Court cannot give them credit for such when their actions demonstrated in fact that he *was not* free to end the interview when he twice wanted to.

Similarly, the second factor is does not mitigate against a finding of custody, because the interviewing officers denied Defendant "unrestrained freedom of movement." Although the interviewing officers did not handcuff or otherwise physically restrain Defendant, "this does not necessarily mean that defendant was free to move about at the interview location[]." <u>United States v. Warsame</u>, 488 F. Supp. 2d 846, 857 (D. Minn. 2007) (Tunheim, J.). The present case bears some resemblance to <u>Warsame</u>, in which officers first contacted the defendant at his apartment, then persuaded him to leave home for a "secure location." <u>Id.</u> at 851. The officers

then took the defendant to a military base where, the court found, his "ability to move about . . . depended on the participation of the agents. [Defendant was on] a military base in a relatively isolated rural location, and [defendant] did not have access to a vehicle." Id. at 857. In the present case, Defendant's ability to leave was likewise controlled by the interviewing officers, who (under the guise of finding a safer location) had driven him to an isolated rural location— not into town, as they had said they would—and who had custody of his driver's license, his vehicle, and his vehicle keys. See United States v. Adames, 885 F. Supp. 610, 616 (S.D.N.Y. 1995) (finding defendant was "in custody" in part because officers "took possession of [defendant]'s car keys, which they did not give back to him. Without his car keys, [defendant] could not leave with his car, and by keeping his keys, the agents conveyed to [defendant] the message that he could not leave at all."). Moreover, when Defendant expressed his desire that the interview end and that the interviewing officers "let me go," they both times persisted in questioning him against Defendant's twice-demonstrated desire to leave.

As to the third factor, the record demonstrates that, although the interview was instigated by law enforcement, Defendant initially acquiesced to being questioned. However, the record also demonstrates that when Defendant later sought twice to end the interview, the interviewing officers nonetheless disregarded his requests and persisted in their questioning. Therefore, the Court finds that the third factor does not mitigate against a finding of custody.

On the other hand, the three aggravating factors weigh somewhat in favor of custody. The fourth factor weighs slightly in favor of custody, because there is evidence that investigators engaged in strong-arm tactics and deceptive strategems. The interviewing officers separated Defendant from his own vehicle, took away his driver's license and car keys, and despite first telling Defendant that they wanted to conduct the interview in the town of Gully, they instead

drove him in a government vehicle to an isolated rural location to conduct the interview. Moreover, under these circumstances, when Defendant twice stated his desire to end the interview and be let go, the officers ignored Defendant and persisted in their questioning for a significant period of time. "Deceit that a reasonable person would perceive as restricting his freedom to depart affects the custody determination." Warsame, 488 F. Supp. 2d at 858 (citing United States v. Ollie, 442 F.3d 1135, 1138-39 (8th Cir. 2006). The Court finds that a reasonable person would perceive the interviewing agents' repeated reassurances that Defendant could end the interview, which inevitably were followed by their repeated refusals to end the interview when sought to do so, as restricting Defendant's freedom.

Likewise, under the circumstances surrounding the interview as previously discussed, the fifth factor weighs in favor of a finding of custody, because the interview was police dominated. In considering this factor, courts examine such considerations as the place and length of the interview. Griffin, 922 F.2d at 1352. The interview in the present case took place in a law enforcement vehicle while Defendant had been physically separated from his own vehicle, vehicle keys, and ID, and Defendant was taken to an isolated rural location for the interview different than the location in the small town of Gully originally suggested and agreed to. See Warsame, 488 F. Supp. at 860 (isolating circumstances at location defendant was taken to contributed to finding that interview was police dominated). More to the point, the interview was police dominated because the interviewing officers unilaterally persisted in questioning Defendant in this isolated location despite his request for counsel and two requests to be let go. Thus, the fifth factor does weigh slightly in favor of a finding of custody.

The sixth and final factor is the easiest to resolve: Defendant was not arrested at the conclusion of the interview, therefore this factor does not support a finding of custody.

Upon reviewing each of the six <u>Griffin</u> factors, the Court considers the following instruction from the Eighth Circuit in <u>Ollie</u>:

> It is important to note that a decision on the matter of custody requires more than tallying a ledger. Where one criterion is particularly influential, the failure to find other indicia of custody is not necessarily fatal. In the end, these criteria are only useful tools meant to focus attention. The ultimate decision requires a hard look at all of the circumstances.

442 F.3d at 1140. In fact, while setting out the factors that have become the standard in the Eighth Circuit, the <u>Griffin</u> court, itself, explained that "[c]ustody occurs either upon formal arrest or under *any other circumstances* where the suspect is deprived of his freedom of action in *any significant way*." 992 F.2d at 1347 (emphasis in original).

Upon the totality of the circumstances at issue in the present case, the Court finds that Defendant was in custody when he was questioned by SA Grosz, Lt. Provost, and CO Reller on July 23, 2012. First, the Court notes that the mere fact that the interviewing officers transported Defendant away from the scene of their initial encounter may be sufficient for a finding that he was in custody. <u>See</u> <u>Florida v. Royer</u>, 460 U.S. 491, 502-03 (1983) (defendant was in custody when he complied with airport officers' request that he accompany them to a police room); <u>Untied States v. Bloomfield</u>, 40 F.3d 910, 917 (8th Cir. 1994) ("The courts have also held that transporting a suspect to another location or isolating him from others can create an arrest" (citation omitted).); <u>United States v. Davis</u>, 21 F. Supp. 2d 979, 983, 987 (D. Minn. 1998) (Noel, C.M.J.) (citing <u>Royer</u>), <u>adopted by</u> 21 F. Supp. 2d 979, 980 (D. Minn. 1998) (Tunheim, J.); <u>see also</u> <u>Warsame</u>, 488 F. Supp. 2d at 857-58 (officers' transport of defendant contributed to finding of custody). In the present case, as in <u>Royer</u> and <u>Warsame</u>, the officers asked Defendant if he objected to moving to another location, and Defendant consented. However, Defendant was not taken into town, as he had been led to believe, but instead was taken to an isolated rural location

outside of town, where the interviewing officers had separated him from control of his ID, his vehicle, and his keys.

Additionally, early in the interview, Defendant requested counsel and twice said that he wanted to be let go, and despite the fact that initially the interviewing officers had told Defendant that he was not under arrest and that he was free to go, the interviewing officers persisted nonetheless in asking him questions. Although Defendant was not handcuffed, he also did not have unrestrained freedom of movement because his ID, his vehicle, and his vehicle keys were taken from him and not returned to him until the conclusion of the interview. Further, because of his being physically separated from his vehicle and vehicle keys, and because of the isolated rural location to which he had been taken by the interviewing officers, Defendant had no present ability to remove himself from the interview location.

Given the totality of the circumstances, a reasonable person in Defendant's position would "have felt that he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). The Court finds that the interviewing officers restrained Defendant's freedom to such a degree as would be associated with formal arrest, thus requiring a Miranda warning, because they transported him to an isolated rural location that was not where they had said they would take him; because they deprived him of his ID, vehicle, and vehicle keys (and, thus, deprived him of his surest means of departing); and because they repeatedly persisted in questioning him after Defendant twice said that he wanted the interviewing officers to "let me go then."

Consequently, the Court recommends that the Defendant's Motion to Suppress Statements, Admissions and Answers, [Docket No. 31], be **GRANTED**, and that the recorded interview be suppressed.

**C. In the alternative, even if Defendant was not in custody during his interview on July 23, 2011, he sufficiently invoked his right to counsel, and any statements made after he did so should be suppressed.**

### 1. Standard of Review

"When a suspect requests counsel during an interrogation, police **must** cease questioning until counsel has been made available or the suspect reinitiates communication with the police." United States v. Havlik, 710 F.3d 818, 821 (8th Cir. 2013) (citing Edwards v. Arizona, 451 U.S. 477, 484-85 (1981) (emphasis added)). "The Supreme Court clarified the Edwards rule [by holding that t]o implicate Edwards, a suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" Id. (quoting Davis v. United States, 512 U.S. 452, 459 (1994)). "Applying these principles, the Court in Davis held the statement '[m]aybe I should talk to a lawyer' was equivocal, and not an invocation of the right to counsel for purposes of Miranda and Edwards." Id. (quoting Davis, 512 U.S. at 462).

### 2. Discussion

The Government argues that Defendant was not reasonably clear in requesting the assistance of counsel by his statement: "Let's go to court. Let's get a lawyer. Let me, let me get a lawyer. Then, then, let me see what I can say with a lawyer around. . . . Read me my rights and then we'll go to jail."

Although the Government is correct that only "a clear and unequivocal request for the assistance of counsel may serve to invoke a defendant's right," (Gov't's Resp. to Def.'s Reply [Docket No. 42], at 7 (quoting United States v. Cloud, 594 F.3d 1042, 1046 (8th Cir. 2010) (quoting, in turn, United States v. Kelly, 329 F.3d 624, 630 (8th Cir. 2003)))), the cases that the Government cites to, and the statements analyzed therein, are easily distinguished from the

unequivocal request in the present case. In <u>Cloud</u>, the defendant was asked whether he wanted an attorney and responded, "Yeah. Probably. Cuz you ain't explaining nothin'." 594 F.3d at 1045. When the interrogators sought to clarify whether the defendant wanted the assistance of counsel, the defendant declined and said that he just wanted to leave with his money. <u>Id.</u> Defendant also cites to <u>Davis</u>, in which the defendant said: "Maybe I should talk to a lawyer," 512 U.S. at 455, and <u>Dormire v. Wilkinson</u>, 249 F.3d 801 (8th Cir. 2001), in which the defendant asked, "Could I call my lawyer?" <u>Id.</u> at 805.

In the present case, Defendant did not ask whether he *could* talk to a lawyer, and did not qualify his request with words like "maybe" or "probably." His statement was precise and direct: "Let's go to court. Let's get a lawyer. Let me, let me get a lawyer." The Court notes that Defendant made his request in the specific context of the present questioning and was seeking advice of counsel with regard to police questioning: "[T]hen, then, let me see what I can say with a lawyer around." Additionally, the Court notes that Defendant, himself, referred to the <u>Miranda</u> warning in the context of his request for an attorney: "Read me my rights and then we'll go to jail." Finally, the Court notes that, after SA Grosz responded to Defendant's request for a lawyer by seeking to direct him away from his perceived need for assistance of counsel by attempting to reassure Defendant that he was not under arrest, Defendant specifically sought to end the interview, saying: "Well then let's go. Let me go then. I've got nothing to say to you guys." The Court concludes that Defendant was unequivocal in his request for a lawyer during questioning, and, consequently, that the interview was required to have ended at that time. In contrast, without providing the requested counsel, the officers' interview continued for quite some time notwithstanding two separate requests by Defendant to be let go.[28]

---

[28] In this context, it cannot be reasonably argued that the continued questioning post invocation of the right to counsel was the result of reinitiation by Defendant voluntarily.

Accordingly, although this Court concludes that the entire interview with Defendant on July 23, 2011, was custodial, even if it was not, in the alternative, the Court concludes that the interview should have been terminated upon Defendant's unequivocal request for a lawyer, and recommends that Defendant's Motion to Suppress Statements, Admissions and Answers, [Docket No. 31], be **GRANTED**.

## IV.    CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Dismiss the Indictment [Docket No. 32] be **DENIED**;

2. Defendant's Motion to Dismiss the Indictment Due to Selective Prosecution, or for Additional Discovery [Docket No. 30] be **DENIED**;

3. Defendant's Motion to Suppress Statements, Admissions and Answers [Docket No. 31] be **GRANTED**.

Dated: August 14, 2013                              s/Leo I. Brisbois
                                                    LEO I. BRISBOIS
                                                    United States Magistrate Judge

## N O T I C E

During the briefing period following the July 2, 2013, motions hearing, upon the requests of both Parties, this Court extended the original time for both parties to prepare and file their briefs on these Motions. Consequently, and in light of the pending trial date of September 23, 2013, the Court now finds it must reduce the time that the parties are allowed to file, and to respond to, objections to this Report and Recommendation.

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by August 23, 2013**, a writing that

38

specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within **seven days** of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.