# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES, | Criminal No. 13-072 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINON AND ORDER REJECTING THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE** |
| LARRY GOOD, | |
| Defendant. | |

Thomas Calhoun-Lopez, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for plaintiff.

Shannon R. Elkins, Assistant Federal Defender, **OFFICE OF THE FEDERAL DEFENDER**, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415, for defendant.

Defendant Larry Good was indicted for violating the Lacey Act by transporting and selling fish in violation of federal regulations. 16 U.S.C. § 3372(a). Good moves to dismiss the indictment on the grounds that, as a member of the Red Lake Band of Chippewa Indians ("Red Lake Band"), his right to fish on the Red Lake Reservation is protected by the 1837 Treaty with the Chippewa ("1837 Treaty"), 7 Stat. 536, July 29, 1837, such that this federal prosecution violates his treaty rights. United States Magistrate Judge Leo I. Brisbois issued a Report and Recommendation ("R&R") recommending that the Court deny Good's motion to dismiss. Good objected to the R&R and the Court will sustain the objection. The Court will dismiss Good's indictment

because the 1837 Treaty protects his right to fish on the reservation and Congress has not

specifically abrogated that right.[1]

## BACKGROUND

## I. CHIPPEWA TREATY RIGHTS

Chippewa Indians occupied much of Minnesota and Wisconsin before European

explorers and settlers arrived. William Watts Folwell, *A History of Minnesota*, Vol. I, 10,

133-34, 159 (1956). In the early 1800s, the United States sought to acquire native lands

through cessation treaties, including much of eastern Minnesota and western Wisconsin

in the 1837 Treaty. *Id.* at 159-60. The 1837 Treaty provided that the Chippewa Indians

would cede these territories to the United States in exchange for cash and goods. *See*

1837 Treaty, 7 Stat. 536, arts. 1-2. The Treaty also provided that:

> The privilege of hunting, fishing, and gathering the wild rice, upon the
> lands, the rivers and the lakes included in the territory ceded, is guarantied
> to the Indians, during the pleasure of the President of the United States.

*Id.*, art. 5. This "privilege" of hunting and fishing is generally referred to as a

"usufructuary right – the right to make a modest living by hunting and gathering off the

land." *United States v. Bresette*, 761 F. Supp. 658, 660 (D. Minn. 1991).

In 1863, the Red Lake Band of Chippewa Indians signed a treaty ceding land to

the United States and reserving some lands for the Red Lake Band. *United States v.*

*Minnesota*, 466 F. Supp. 1382, 1383-84 (D. Minn. 1979), *aff'd sub nom. Red Lake Band*

---

[1] The Court addresses a similar treaty-based argument in *United States v. Brown* and
*United States v. Reyes*, (Cr. Nos. 13-68, 13-70), in a separate memorandum opinion and order
because the legal questions presented by those cases are not identical to that of this case.

*of Chippewa Indians v. Minnesota*, 614 F.2d 1161 (8ᵗʰ Cir. 1980). The Red Lake

Reservation is one of seven Chippewa reservations in the state of Minnesota. *See Leech*

*Lake Band of Chippewa Indians v. Herbst*, 334 F. Supp. 1001, 1002-03 (D. Minn. 1971).

Although courts have determined that the Red Lake Band does not retain usufructuary

rights on the lands ceded to the United States in the 1863 and subsequent treaties, the

parties do not dispute that members of the Red Lake Band retain usufructuary rights on

the reservation. *See United States v. Dion*, 476 U.S. 734, 738 (1986) ("As a general rule,

Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them, unless

such rights were clearly relinquished by treaty or have been modified by Congress.").

Courts have consistently interpreted the 1837 and subsequent Chippewa treaties to

preserve the 1837 Treaty's hunting and fishing rights for Chippewa Indians on Chippewa

reservations. In *Herbst*, the court held that these hunting and fishing rights on the Leech

Lake Reservation were not extinguished by the Nelson Act of 1889, which permitted

parcels from the reservation to be sold to white settlers. 334 F. Supp. at 1104-05; *see*

*also Cass Cnty., Minn. v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 106-08

(1998) (purpose of allotment acts such as Nelson Act was to "assimilate Indians into

American society and to open reservation lands to ownership by non-Indians"). The

court held that the treaty-based hunting and fishing rights gave the tribe exclusive

jurisdiction over hunting and fishing on the reservation such that state fishing and gaming

laws did not apply to members of the tribe on the reservation. *Herbst*, 334 F. Supp. at

1004-06.

Similarly, the Supreme Court in *Minnesota v. Mille Lacs Band of Chippewa Indians* held that the 1837 Treaty protected the right of Chippewa Indians to hunt and fish on the Mille Lacs Reservation. 526 U.S. 172, 196-202 (1999). There the State claimed that language in the 1855 Treaty (which created the Leech Lake Reservation) stating that "'Indians do further fully and entirely relinquish and convey to the United States, any and all right, title, and interest, of whatsoever nature the same may be, which they may now have in, and to any other lands in the Territory of Minnesota or elsewhere,'" terminated any usufructuary rights the Chippewa may have had. *Mille Lacs Band*, 526 U.S. at 195 (quoting 10 Stat. 1166). But the Supreme Court found otherwise, observing that the treaty is "devoid of any language expressly mentioning – much less abrogating – usufructuary rights." *Id.* The Supreme Court also noted that the Senate chairman of the Committee on Indian Affairs at the time the 1855 Treaty was signed stated that the treaties would reserve to the Chippewa "those rights which are secured by former treaties," and that statements by a Chief of one band party to the treaty emphasized that the purpose of the treaty was the transfer of land, suggesting that "the Chippewa did not understand the proposed Treaty to abrogate their usufructuary rights as guaranteed by other treaties." *Id.* at 197-98 (internal quotations and citations omitted).

The Minnesota Supreme Court has held similarly with regard to another Chippewa reservation: the White Earth Reservation. *State v. Clark*, 282 N.W.2d 902, 908-09 (Minn. 1979). The court found that Chippewa Indians on the White Earth Reservation retained usufructuary rights because

it is clear from the record that hunting and fishing were an important part of the Chippewa's lifestyle and that the need to pursue these activities was a significant consideration in motivating them to negotiate with the government during this period of time. Moreover, the record reflects that for a considerable period after 1867 the White Earth Indians relied, in large part, upon hunting and fishing for their basic sustenance. . . . [E]ven absent such a clear showing of the Indians' understanding, we believe that they have such rights because hunting and fishing are a basic incident of reservation status.

*Id.* (citing *Menominee Tribe of Indians v. United States*, 391 U.S. 404 (1968)).


## II.    LACEY ACT

The Lacey Act was initially passed in 1900 as one of the first federal wildlife protection laws, outlawing interstate sale or transport of birds or other animals killed illegally in their state of origin. Lacey Act, 16 U.S.C. §§ 3371 *et seq.*; S. Rep. 97-123, at 2 (1981), *reprinted in* 1981 U.S.C.C.A.N. 1748, 1749. Congress amended the Lacey Act in 1981 to strengthen the Act's effectiveness as a wildlife law enforcement tool. Lacey Act Amendments of 1981, Pub. L. No. 97-79, 95 Stat. 1073. In particular, Congress added violations of tribal law to the possible grounds for violation of the Lacey Act:

It is unlawful for any person . . . to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken or possessed in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law . . . .

*Id.* § 3(a)(1) (codified at 16 U.S.C. § 3372(a)). The Senate Report explained the rationale for this addition:

Because of the resource management responsibilities of Indian tribes, the legislation proposes that like the current Black Bass Act, the provisions of the [Lacey] Act apply to fish and wildlife taken in violation of Indian tribal law or regulations.

S. Rep. 97-123 at 4, 1981 U.S.C.C.A.N. at 1751. The Government brings the Lacey Act charges here for alleged violations of federal regulations.

## III.     INDICTMENT

There is no dispute that Defendant Good is an enrolled member of the Red Lake Band. Good was indicted with violating the Lacey Act, 16 U.S.C. § 3372, by transporting and selling fish in violation of federal regulation. Specifically, Good is accused of taking fish from Red Lake for commercial purposes without the knowledge or approval of the Red Lake Fisheries Association in violation of 25 C.F.R. §§ 242.2 and 242.4. (Indictment, Apr. 9, 2013, Docket No. 1.) Section 242.2 provides:

> No person shall engage in commercial fishing in the waters of the Red Lakes on the Red Lake Indian Reservation in the State of Minnesota except the Red Lake Fisheries Association . . . and its members . . . .

25 C.F.R. § 242.2. Section 242.4 provides:

> (a) Enrolled members of the Red Lake Band of Chippewa Indians may take fish at any time . . . from waters of the Red Lakes on the Red Lake Indian Reservation for their own use and for sale to:
>
>> (1) Other Indians on the reservation and
>>
>> (2) Licensed traders on the reservation for resale to Indians.
>
> (b) Fish may be taken for commercial purposes only by the Association through members of the Association in residence on the reservation during the fishing season which shall be May 15 to November 15 inclusive. All fish taken for such purposes shall be marketed through the Association.

*Id.* § 242.4.

Good moves to dismiss the indictment on the grounds that he cannot be prosecuted for fishing activities on the reservation because his right to fish on the reservation is

protected by the 1837 Treaty.[2] (Mot. to Dismiss the Indictment, June 20, 2013, Docket No. 32.) The Magistrate Judge issued an R&R recommending that the motion to dismiss be denied. (R&R, Aug. 14, 2013, Docket No. 43.) Good objects to the R&R, arguing that the Magistrate Judge analyzed the potential treaty conflict improperly and incorrectly concluded that the prosecutions could proceed because Good is not exempt from the prohibitions of the Lacey Act. The Court now considers Good's objections to the R&R on the issue of the potential treaty conflict and concludes that Good's rights under the 1837 Treaty preclude federal prosecution under the Lacey Act because Congress has not specifically abrogated his rights under the Treaty.

## ANALYSIS

### I. STANDARD OF REVIEW

Upon the filing of a report and recommendation by a magistrate judge, a party may "serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); *accord* D. Minn. LR 72.2(b)(1). "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3).

### II. MOTION TO DISMISS THE INDICTMENT

Good objects to the recommendation of the Magistrate Judge that the Court deny his motion to dismiss the indictment. He argues that the Magistrate Judge's R&R

---

[2] Good has also filed other motions at this time, including a motion to dismiss for selective prosecution and a motion to suppress certain statements. The Court does not reach these issues because it dismisses the indictment against Good based on his treaty rights.

erroneously framed the relevant question as whether the 1837 Treaty exempts him from the Lacey Act and thus came to the incorrect conclusion that his prosecution under the Lacey Act is not precluded by his Treaty rights. Good argues instead that the fishing rights under the 1837 Treaty insulate him from this federal prosecution under the Lacey Act.

### A. Method for Analyzing Potential Conflict Between Treaties and Statutes

The dispute here begins with how the Court should approach the issue. The Government urges the Court to look first, and only, to the Lacey Act to conclude that the Lacey Act applies to Indians, including Good.[3] This mirrors the approach employed by the Magistrate Judge in the R&R. The Magistrate Judge applied an analysis in which he first queried whether the Lacey Act applies to Indians. If so, he reasoned, the 1837 Treaty must specifically exempt Good from the Lacey Act, in order for Good to be free from this federal prosecution. Only then, after "a court determines that there is a treaty right that exempts Indians from the operation of a Federal statute of general applicability, [does] the court next ask[] whether that treaty right was abrogated by Congress." (R&R

---

[3] At oral argument, counsel for the Government informed the Court that the response to Good's objections to the R&R that the Government filed contained the wrong arguments – those pertaining to the defendants in *United States v. Reyes*, Cr. No. 13-70, and *United States v. Brown*, Cr. No. 13-68 – rather than the arguments it intended to make in response to Good's objections. (*See* Resp. to Objections to the R&R, Sept. 20, 2013, Docket No. 52.) The Government advised the Court to look to a different defendant's docket, *United States v. Bellefy*, Cr. No. 13-71, for the response pertaining to a defendant such as Good, whose Lacey Act indictment is based on federal regulations rather than on tribal law. (*See, e.g.*, Cr. No. 13-71, Resp. to Objections to the R&R, Sept. 27, 2013, Docket Nos. 105, 106.) The Government has not sought to correct the mistake on this docket. Nevertheless, the Court will consider the Government's arguments that pertain to the issues in this case presented on the *Bellefy* docket, in addition to those in the response actually filed on this docket that are relevant to the issues presented by this case.

at 10, 12.)  The Government maintains that Good's treaty rights have no effect upon the operation of the Lacey Act.  (Resp. to Objections to the R&R at 2, Sept. 20, 2013, Docket No. 52 ("Treaty rights are not at play here.").)

In contrast, Good urges the Court to follow the approach adopted by the Supreme Court in cases presenting a potential conflict between a treaty and a statute.  (Obj. to R&R at 6, Sept. 3, 2013, Docket No. 46 (citing *United States v. Dion*, 476 U.S. 734, 739 (1986).)  This approach involves determining first the scope of the treaty's protection – whether it protects the conduct at issue – and second whether Congress has specifically abrogated that protection.

The Supreme Court has made clear that if there is a treaty right that protects the relevant conduct, the question is whether Congress has abrogated that right, not whether the right has specifically exempted the party to the treaty from an Act that would otherwise generally apply.  *See Dion*, 476 U.S. at 737-40 (after determining that treaty rights included exclusive right to hunt and fish on the land, determined whether Congress specifically abrogated those rights); *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 689-90 (analyzing first the scope of protection under the treaty and second whether Congress specifically abrogated that protection), *modified sub nom. Washington v. United States*, 444 U.S. 816 (1979).

The Court will follow the approach adopted by the United States Supreme Court in *United State v. Dion*: first considering the scope of the 1837 Treaty's protection and

then whether Congress has explicitly abrogated that protection.[4]  This approach has been used widely by other courts analyzing potential conflicts between Indian treaty rights and federal criminal statutes.  *See, e.g.*, *United States v. Gotchnik*, 222 F.3d 506, 509 (8th Cir. 2000) (determining that defendants "clearly possess the right to hunt and fish in the ceded territory" under the Bands' Treaty and that the right had not been abrogated, before considering whether the statute offended the treaty rights by prohibiting use of motorboats and motor vehicles in the area).

---

[4] Some formulations of this approach involve a third inquiry – whether the prohibition at issue, here, the Lacey Act or the regulations, is a nondiscriminatory conservation measure.  *See Puyallup Tribe v. Dep't of Game of Wash.*, 391 U.S. 392, 398 (1968).  Good argues that under this analysis, the regulations do not survive as valid, nondiscriminatory measures.  (*See* Letter to District Judge, Oct. 23, 2013, Docket No. 54.)  But that inquiry was necessary in *Puyallup* because the treaty rights at issue protected hunting and fishing "in common with" other citizens of the territory so "any ultimate findings on the conservation issue must also cover the issue of equal protection implicit in the phrase 'in common with.'"  *Puyallup*, 391 U.S. at 395, 403.  Here, the treaty contains no language requiring the Chippewa to share their fishing rights "in common" with non-Indians.  Rather, courts in this district have already held that the broad scope of the Chippewa's fishing rights precludes state regulation of tribe members' fishing and hunting.  *Herbst*, 334 F. Supp. at 1006.  Thus, the Court need not engage in this third inquiry because the treaty language does not contemplate that the Chippewa share their hunting and fishing rights with non-Indians. *See United States v. Bresette*, 761 F. Supp. 658, 664 (D. Minn. 1991) (rejecting government's argument that "a statute of general applicability may limit Indian treaty rights under *Puyallup* even if it is not a clear abrogation of those rights as required under *Dion*" finding that "the court [in *Puyallup*] interpreted the Indians' fishing rights to be in common with other groups," and therefore determined that "the particular conservation measures did not exceed the Indians' understanding of the treaty" (emphasis omitted)).  Thus, in *Puyallup*, the Supreme Court determined that the treaty **did not** protect the Indians' exclusive right to fish in the manner and mode that the state prohibited, so there was no need to consider abrogation, but only whether those state regulations were valid conservation measures that did not discriminate against Indians.  *Puyallup*, 391 U.S. at 395-403.  Here, the Court concludes that Defendants **do** have a treaty-protected right to the fishing underlying the indictment, but Congress has not abrogated that right.  Thus, there is no need to analyze whether the Lacey Act or the regulations are valid nondiscriminatory conservation measures, because even if they were, they cannot be applied to Defendants in violation of their treaty rights.

Moreover, the Court has found no Supreme Court precedent, and the Government has presented none, endorsing an approach that looks for a treaty to **exempt** Indians from the application of federal law rather than for the federal statute to **abrogate** the treaty rights.[5]  Given that the 1837 Treaty pre-dates the Lacey Act (predating the present version of the Act by almost 150 years), it would make little sense for the Treaty to specifically and affirmatively exempt its beneficiaries from an Act passed many years

---

[5] The only precedent endorsing such an approach is based on a different treaty.  *See United States v. Sohappy*, 770 F.2d 816 (9th Cir. 1985).  There, the Ninth Circuit first determined that the relevant treaty, which granted hunting and fishing rights "in common with" other citizens of the territory, did not protect an exclusive right for the tribe to regulate hunting and fishing or for the defendant to engage in the prohibited conduct.  *Id.* 818-20.  The court then proceeded to consider whether Congress intended the Lacey Act to apply to Indians, concluding that it did, and that the treaty did not exempt Indians from the Lacey Act.  *Id.* at 818-21.  The Court is not persuaded that *Sohappy* provides precedent for inquiring into whether a treaty **exempts** the Chippewa from the Lacey Act, both because it addressed a different, less protective treaty right, and because it is counter to the Supreme Court's directive in *Dion* that hunting and fishing treaty rights must be **abrogated** in order to not apply.

To the extent the Eighth Circuit seems to have endorsed this approach in *United States v. Stone*, 112 F.3d 971, 973-74 (8th Cir. 1997), by citing *Sohappy* for the proposition that "federal laws of general applicability are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question," *id.* at 974 (internal citations omitted), its reference to *Sohappy* conflicts with Supreme Court precedent requiring courts to consider abrogation rather than exemption.  *See also United States v. Big Eagle*, 881 F.2d 539, 540 n.1 (8th Cir. 1989) (referencing *Sohappy* to conclude that treaty did not protect Indian from prosecution for fishing on reservation of which he was not a member).  Moreover, the origin of this line of dicta in *Stone* lies in the general applicability of federal criminal laws on reservations, *see Stone*, 112 F.3d at 974 (citing *United States v. Burns*, 529 F.2d 114, 116-17 (9th Cir. 1975)), where federal authority to enforce criminal laws that did not implicate treaty rights was unclear – not in the context of treaty-protected usufructuary rights.  *See Burns*, 529 F.2d at 116-17 ("federal statutes of general applicability that make actions criminal wherever committed," such as the crime of being a felon in possession of a firearm, apply to Indians on reservations unless a treaty states otherwise).  In contrast, "areas traditionally left to tribal self-government, those most often the subject of treaties, have enjoyed an exception from the general rule that congressional enactments, in terms applying to all persons, includes Indians and their property interests."  *United States v. White*, 508 F.2d 453, 455 (8th Cir. 1974) (footnote omitted).

later.  *Cf. United States v. White*, 508 F.2d 453, 456 (8th Cir. 1974) ("Generally, in the case of a conflict between an Act of Congress and a treaty, the one last in date must prevail.  However, a treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed." (citation omitted)).

### B.      Treaty Conflict Analysis

Within this framework for considering the potential conflict between the 1837 Treaty and the Lacey Act, the parties do not dispute that the 1837 Treaty fishing rights apply to Good's activity on the Red Lake Reservation.  Rather, they dispute whether those rights encompass the sale of fish and whether the Lacey Act applies to Good despite those rights.  The Court therefore must first determine whether the Treaty's protection encompasses Good's conduct and second, if so, whether Congress has abrogated this protection.

### 1.      Scope of the 1837 Treaty's Protections

In the first part of this analysis, the Court must determine whether the 1837 Treaty protects Good's right to engage in the conduct underlying the indictment.  Interpretation of Indian treaties is "guided by special rules of construction."  *Gotchnik*, 222 F.3d at 509.  We are to "interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them."  *Mille Lacs Band*, 526 U.S. at 196.  Treaties are to be "interpreted liberally in favor of the Indians," *id.* at 194 n.5, and any ambiguities are to be resolved in the Indians' favor, *Winters v. United States*, 207 U.S. 564, 576-77 (1908).

*See also Cnty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502

U.S. 251, 269 (1992); *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985);

*Bresette*, 761 F. Supp. at 661 ("It is axiomatic that Indian treaty rights are to be afforded a

broad construction and, indeed, are to be interpreted as the **Indians** understood them

because the Indians were generally unlettered and the government had great power over

the Indians with a corresponding responsibility toward them." (emphasis in original)).

As a general matter, "Indians enjoy exclusive treaty rights to hunt and fish on

lands reserved to them, unless such rights were clearly relinquished by treaty or have

been modified by Congress." *Dion*, 476 U.S. at 738. These fishing rights are held

individually by Good, as treaty rights can be asserted by individual tribe members. *Id.* at

738 n.4. Specifically, the Court is persuaded that the 1837 Treaty right encompasses sale

of the fish, based on the understanding of the Chippewa at the time the treaty was signed.

The 1837 Treaty was signed by the leaders of several bands of Chippewa Indians,

along with representatives of the United States government after several days of

negotiation that took place at Fort Snelling. Lawrence Taliaferro, *Autobiography of Maj.

Lawrence Taliaferro* 214, *in* 6 Minnesota Historical Collections (1864). During the

negotiations, Chippewa leaders expressed their desire to retain the right to hunt and fish

on the ceded lands. Chippewa leader Hole in the Day stated: "My father, in all the

country we sell you, we wish to hold on to that which gives us life – the streams and

lakes where we fish, and the trees from which we make sugar." Henry Dodge,

*Proceedings of a Council with the Chippewa Indians*, 9 Iowa J. Hist. & Pol. 408, 424

(1911). Governor Henry Dodge of Wisconsin Territory, which in 1837 included all of

the future State of Minnesota, later responded that "I will agree that you shall have the free use of the rivers and the privilege of hunting on the lands you are to sell, during the pleasure of your great father." *Id.* at 427. Another Chippewa leader, Flat Mouth, a chief from Leech Lake, stated:

> Your children are willing to let you have their lands, but wish to reserve the privilege of making sugar from the trees, and getting their living from the lakes and rivers as they have heretofore done, and of remaining in the country. It is hard to give up the land. It will remain and cannot be destroyed, but you may cut down the trees, and others will grow up. You know we cannot live deprived of lakes and rivers.

*Id.* at 428. Governor Dodge responded to this: "My friends, I have listened with great attention to your chiefs from Leech Lake. I will make known to your great father your request to be permitted to make sugar on the lands, and you will be allowed during his pleasure to hunt and fish on them." *Id.* at 429.

These statements strongly indicate that both the Chippewa and the representatives of the United States understood the Treaty to reserve to the Chippewa a broad right to fish as they had been accustomed – without material restriction. Notably, one chief stated that the Chippewa wished to reserve the privilege of "getting their living from the lakes and rivers as they have heretofore done." *Id.* at 428. This is most reasonably understood to encompass the sale of fish, because in order to make a 'living' off of the lakes, Indians may have needed to sell or trade the yield. As the court held in *Bresette*, "the Chippewa were part of the national and international market economy at the time of the treaties." 761 F. Supp. at 662 (citing *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 653 F. Supp. 1420, 1424 (W.D. Wis. 1987) (the Chippewa "harvested

resources for their own immediate, personal use and for use as trade goods in commerce")). The court in *Bresette* found that the Chippewa's right to hunt and gather the feathers from birds encompassed a right to sell the feathers, finding that there was "ample evidence that the Chippewa understood that their hunting and gathering rights . . . encompassed the sale of their catch." *Id.* at 662, 664-65 (treaty right precluded prosecution for sale of feathers under the Migratory Bird Treaty Act).

### 2. Congressional Abrogation

The Court must next determine whether Congress has exercised its power to abrogate this treaty-protected right. *See Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 594 (1977). Here, there are at least two congressional enactments that could be interpreted as having abrogated the 1837 Treaty's protections: the Lacey Act and the statutes authorizing the federal regulations that serve as the basis of Good's Lacey Act indictment.

Courts should conclude that Congress has abrogated treaty rights only if Congress has clearly expressed its intent to do so, as "the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress." *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 413 (1968) (internal quotation marks omitted); *see also South Dakota v. Bourland*, 508 U.S. 679, 687 (1993). Courts have been "extremely reluctant to find congressional abrogation of treaty rights" absent explicit statutory language, *Washington*, 443 U.S. at 690, as "Indian treaty rights are too fundamental to be easily cast aside," *Dion*, 476 U.S. at 738-39. The Supreme Court in *Dion* acknowledged that courts have

applied differing standards as to the degree of clarity and specificity with which Congress must abrogate a treaty, but clarified that "[w]hat is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Id.* at 739-40. In making this determination, the plain text of the statute is preferred over other sources, but there is no per se rule against utilizing legislative history in determining whether Congress intended to abrogate the treaty. *Id.* at 739.

### a.    Lacey Act

The Government argues that the Lacey Act applies to Indians, and that because it applies to Indians, Congress has abrogated any treaty-based fishing right. As support, the Government cites *United States v. Sohappy*, which held that the Lacey Act could be enforced against Indians for fishing violations in the state of Washington despite treaty-based usufructuary rights, reasoning that "it is only reasonable to assume that Congress intended the Lacey Act to encompass everyone, including Indians." *United States v. Sohappy*, 770 F.2d 816, 821 (9th Cir. 1985); *see also United States v. Big Eagle*, 881 F.2d 539, 540 n.1 (8th Cir. 1989) ("[T]he Lacey Act, by its terms and definitions, applies to Indian people." (citing *Sohappy*, 770 F.2d at 820-22)). In *Sohappy*, the relevant treaty protected the right of Indians to hunt and fish at all "usual and accustomed places," but "in common with citizens of the Territory." 770 F.2d at 819 (quoting treaty language). The court's reasoning relied on a determination that "the Indians do not have any treaty reserved right to exclusive jurisdiction over such fishing matters." *Id.* at 820 (emphasis

omitted).  Thus, the Lacey Act, applying generally to Indians, applied to the Indians in *Sohappy* because the treaty there did not protect an exclusive right to hunt and fish.

Here, the 1837 Treaty contains no language requiring that the hunting and fishing rights be shared and has been interpreted as providing for exclusive tribal authority to regulate fishing and hunting.  *Herbst*, 334 F. Supp. at 1006 ("Indians have the right to hunt and fish and gather wild rice on public lands and public waters of the Leech Lake Reservation free of Minnesota game and fish laws.").[6]  Thus, the inquiry and analysis here is distinct from that of *Sohappy*:  the question is whether Congress intended the Lacey Act to apply even to Indians who hold fishing rights that are exclusive and **not** shared in common with non-Indians.  Certainly, the federal government has the authority to exercise jurisdiction to limit tribe members' fishing and hunting, but in order to do so Congress must make explicit its intent to abrogate the treaty rights.  *Rosebud Sioux Tribe*, 430 U.S. at 594.

There is no indication in the text of the Lacey Act that Congress intended to abrogate individual Chippewa members' fishing rights.  Rather, the Lacey Act includes a specific disclaimer that: "[n]othing in this chapter shall be construed as . . . repealing, superseding, or modifying any right, privilege, or immunity granted, reserved, or established pursuant to treaty, statute, or executive order pertaining to any Indian tribe, band, or community."  16 U.S.C. § 3378(c)(2).  This plainly dispels any possibility that Congress intended to abrogate Good's fishing rights under the 1837 Treaty.  *Cf.*

---

[6] The court in *Herbst* concluded, however, that the Leech Lake tribe did not have the exclusive jurisdiction to regulate fishing and hunting by **non-Indians**.  334 F. Supp. at 1006. This determination does not affect the analysis here, as Good is a member of a Chippewa tribe.

*Gotchnik*, 222 F.3d at 509 (finding that the Boundary Waters Act did not abrogate treaty rights to hunt and fish in relevant territory where the Act stated "[n]othing in this Act shall affect the provisions of any treaty now applicable to lands and waters which are included in the mining protection and the wilderness" (internal quotation marks omitted)). The text of the Lacey Act includes another disclaimer that "[n]othing in this chapter shall be construed as . . . enlarging or diminishing the authority of any State or Indian tribe to regulate the activities of persons within Indian reservations." 16 U.S.C. § 3378(c)(3). This further dispels any possibility that Congress intended to abrogate any rights under the Treaty.

The legislative history also supports this conclusion. The Senate Report on the 1981 amendments to the Lacey Act – the amendments which added tribal law as a basis for violation under the Act – acknowledges the lack of clarity at the time about the extent to which tribes and states exercised concurrent or exclusive jurisdiction on tribal lands:

> Nothing in this Act shall be construed as enlarging or diminishing the authority of any state or Indian tribe to regulate the activities of persons within the Indian reservations. The Committee recognizes that there is a continuing controversy about the extent of state and tribal jurisdiction over resources within Indian reservations and regarding non-Indians on those reservations. Nothing in this Act is intended to preempt whatever jurisdiction individual states may have over resources within Indian Reservations under existing law, nor is it intended to alter or change the existing authority of Indian tribes over resources within their reservations.

S. Rep. 97-123, 18, 1981 U.S.C.C.A.N. at 1765 (internal citations omitted). This suggests that Congress was aware that different Indian treaties provided various degrees of protection and exclusivity and that Congress did not intend to disrupt or alter those varying degrees of protection.

Only two provisions of the Lacey Act offer any basis upon which to argue that Congress intended the Act to empower the federal government to limit Indian hunting and fishing on the Chippewa Reservations. First and most obviously, the prohibitions include violation of "Indian tribal law" as a basis for a violation under the Act. 16 U.S.C. § 3372(a)(1). Second, the enforcement section provides that "the Secretary may enter into such contracts, leases, cooperative agreements, or other transactions with any Federal or State agency, Indian tribe, public or private institution, or other person, as may be necessary to carry out the purposes of this chapter." *Id.* § 3376(b).

But these provisions do not indicate any intent by Congress that the Act's prohibitions would apply to Indians holding exclusive treaty-based rights to hunt and fish. Rather, they are best interpreted as permitting and facilitating federal enforcement of tribal law violations in situations that would not offend treaty rights. For example, this could include federal enforcement of tribal law against non-Indians on Indian land. *See, e.g.*, *Herbst*, 334 F. Supp. at 1006 (Leech Lake Indians hold "aboriginal fishing and hunting rights," but not the "exclusive right to regulate hunting and fishing of Indian and non-Indian alike on the reservation"). This could also include federal enforcement (in conjunction with tribes or states) of the Lacey Act where fishing rights are held "in common" with non-Indians, as with the treaty rights in *Sohappy*. Nothing in the text or the legislative history suggests that the possibility of joint or concurrent enforcement **in some cases** indicates Congress's specific intent to abrogate treaty rights in cases where those rights protect an exclusive right to hunting and fishing. These provisions are not rendered superfluous under the Court's interpretation that the Lacey Act did not abrogate

the 1837 Treaty rights and therefore does not permit federal prosecution for violations of tribal fishing law. Neither provision contains the kind of explicit recognition of the treaty rights and choice to abrogate them required by the Supreme Court. *See Dion*, 476 U.S. at 739-40.

In light of the express disclaimers that the Lacey Act does not affect treaty rights and the legislative history's acknowledgment of the uncertain state of tribal and state jurisdiction at the time, the best interpretation of the Lacey Act as a whole is that Congress intended all extant treaty rights to remain intact. Where treaty rights do not preclude concurrent regulation of fishing and hunting by tribe members on the reservation, the Lacey Act would provide for federal enforcement of tribal law, but not where a treaty protects exclusive hunting and fishing rights for its members, as with the Chippewa's 1837 Treaty rights.

### b. Federal Regulations and Authorizing Statute

In addition to the Lacey Act, there is another federal action here that could be interpreted as having abrogated Good's rights under the 1837 Treaty. The Government argues that the federal regulations underlying Good's Lacey Act indictment, 25 C.F.R. §§ 242.2, 242.4, are a valid restraint on Good's fishing activities regardless of any treaty rights he may hold. Similarly, the Magistrate Judge recommended that the Court "need not reach the question of whether Defendant's treaty right to fish was abrogated by the Lacey Act, because the Court finds that the Federal regulations governing fishing on Red Lake legitimately limit the scope of this right." (R&R at 17.) This is contrary to the

directives of the Supreme Court that treaty rights may be abrogated only by an explicit act of Congress. *See Dion*, 476 U.S. at 738.

The Magistrate Judge relied on the Ninth Circuit's decision in *United States v. Eberhardt*, 789 F.2d 1354 (9th Cir. 1986), to determine that Good's treaty rights could be abrogated by federal regulations limiting on-reservation fishing. There the court considered a similar criminal prosecution: for violation of the Lacey Act based on federal regulations which had imposed a moratorium on commercial fishing on the Hoopa Valley Indian Reservation. *See id.* at 1356-57 (citing 25 C.F.R. § 250.8(e) (1985)). The defendants challenged their prosecution under the Lacey Act on the grounds that the Department of Interior lacked the authority to promulgate regulations limiting commercial fishing because such regulations violated their fishing rights under the federal statute that created the reservation. *Id.* at 1357-59. The Ninth Circuit rejected this argument, concluding that Congress authorized the Department to promulgate such regulations in 25 U.S.C. §§ 2, 9. *Id.* at 1359-60. Section 2 states that:

> The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations.

25 U.S.C. § 2. Section 9 states that:

> The President may prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs, and for the settlement of the accounts of Indian affairs.

*Id.* § 9. The court concluded that these statutory provisions gave the Department the authority to promulgate the Indian fishing regulations and, as a result, rejected the

appellees' argument that "the regulations are invalid in the absence of specific legislation giving Interior authority to regulate Indian fishing" in light of their treaty rights. *Eberhardt*, 789 F.2d at 1359-60. The court claimed that it did not interpret the authorizing statute, 25 U.S.C. §§ 2, 9, as abrogating the treaty right. *Id.* at 1361 ("We need not consider regulations purporting to implement statutorily mandated abrogation of previous rights because this case does not involve a congressional statute modifying Indian rights."). Instead, the court reasoned that because **states** could impose reasonable and necessary limitations on Indian fishing for the purposes of conservation and the Department's authority was broader than that of a state, the validity of the Department's regulation need not be held to the same standard and instead should be adjudged by the limitations on agency action in the Administrative Procedure Act, 5 U.S.C. §§ 500, *et seq.*; *Eberhardt*, 789 F.2d at 1361-62 ("Interior has a broader scope of authority to regulate Indian fishing than do the states" so "the district court erred in requiring Interior to justify the ban on commercial fishing by showing" the standard applied to a state regulation). The court reversed and remanded to the district court to determine whether the regulations were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," *id.* at 1362 (citing 5 U.S.C. § 706(2)(A)), and whether the Department utilized the procedures required by the Administrative Procedure Act, *id.* (citing 5 U.S.C. § 706(2)(D)).

This analysis does not control here. Even if the Court were bound by the Ninth Circuit's ruling, the court's analysis in *Eberhardt* is contrary to the directive of the Supreme Court that treaty rights may be abrogated only by an act of Congress, *see Lone*

*Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903) ("Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government."), which the Supreme Court reiterated just a month after *Eberhardt* was issued in *United States v. Dion*. *Dion*, 476 U.S. at 738-39 (Indian treaty-based hunting and fishing rights are reserved "unless such rights were clearly relinquished by treaty or have been modified by Congress," and Congress must make such an intent clear such that there is "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty").

Thus, the regulations themselves do not abrogate Good's treaty rights because they are not an act of Congress. The question remains whether there is sufficient evidence in the statute that the regulations implement, 25 U.S.C. §§ 2, 9, indicating that Congress intended to abrogate the 1837 Treaty's fishing protections. The Court concludes that there is not. The relevant sections of the statute are broad grants of general authority to the Secretary of the Interior and to the President to manage "Indian affairs" and relations. 25 U.S.C. §§ 2, 9. They contain no indication or language referring to treaty-based fishing rights that could amount to the kind of evidence that Congress considered the treaty rights and **chose** to abrogate them that the Supreme Court requires. *See Dion*, 476 U.S. at 739-40. They originate in acts passed in 1832 and 1834, 4 Stat. 546, 738, at a time in which policies of almost "total tribal self-government" prevailed. *Organized Vill. of Kake v. Egan*, 369 U.S. 60, 63 (1962). Since then, courts have repeatedly interpreted

Indian treaty-based fishing rights to persist, including the 1837 Treaty rights at issue here. *See Mille Lacs Band*, 526 U.S. at 189-207; *Herbst*, 334 F. Supp. at 1002-03. Moreover, courts interpreting the sections have disputed whether they even provide authority for the Department of the Interior to promulgate regulations. *Compare Egan*, 369 U.S. at 63 ("[T]he Interior Department itself is of the opinion that the sole authority conferred by [Section 2] is that to implement specific laws, and by [Section 9] that over relations between the United States and the Indians – not a general power to make rules governing Indian conduct."), *with Washington*, 443 U.S. at 691 ("The Indians' fishing rights and responsibilities have instead been the subject of separate regulations promulgated by the Interior Department, under its general Indian powers."). Thus, neither the text of the statute, interpretations of the statute, nor the circumstances of this specific treaty provide any support for concluding that 25 U.S.C. §§ 2 and 9 abrogated the 1837 Treaty rights.

## CONCLUSION

The Court concludes that Good's rights under the 1837 Treaty preclude his prosecution under the Lacey Act. The 1837 Treaty protects Good's right to engage in the conduct underlying the indictment, which may be abrogated by only an act of Congress. Congress has not abrogated that right, either in the Lacey Act or in the statute authorizing the Department of Interior to promulgate the regulations.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, the Court **SUSTAINS** defendant's objections [Docket No. 46] and **REJECTS** the Report and

Recommendation of the Magistrate Judge [Docket No. 43] as discussed in the memorandum opinion.  Accordingly, **IT IS HEREBY ORDERED** that:

1.      Defendant's Motion to Dismiss the Indictment [Docket No. 32] is **GRANTED**.

2.      Defendant's Motion to Dismiss the Indictment Due to Selective Prosecution [Docket No. 30] is **DENIED as moot**.

3.      Defendant's Motion to Suppress [Docket No. 31] is **DENIED as moot**.

DATED:  November 25, 2013                    _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                        United States District Judge